Thomas H. DURKIN

v.

John V. TAYLOR et al.

Civ. A. No. 77–0007–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 10, 1977.

Leonard S. Rubenstein, Alexandria, Va., for plaintiff.

Patrick A. O'Hare, Asst. Atty. Gen., Richmond, Va., for defendants.

## MEMORANDUM

WARRINER, District Judge.

Thomas H. Durkin, a prisoner of the Commonwealth of Virginia confined at the Pre-Release Center in Chesterfield, brought this civil rights action pursuant to 42 U.S.C. § 1983. Jurisdiction of this Court is invoked under 28 U.S.C. § 1343(3) (1970). Plaintiff and defendants have each moved for summary judgment. For reasons given below defendants' motion will be granted

and plaintiff's motion will be denied. The facts are as follows.[1]

Plaintiff had been approved for a weekend furlough beginning at 5:00 p. m. on 22 October 1976. At approximately 2:10 p. m. on that date plaintiff requested of a Center official that he be given his furlough pass immediately. Plaintiff was at this time participating in a work-release program and at 2:10 p. m. he was about to leave the Center for his place of employment. Plaintiff requested an early pass so that he could begin his furlough promptly at 5:00 p. m. rather than having to return to the Center after work for his pass. Making the trip from his place of employment back to the Center to secure his pass would have meant that plaintiff could not actually commence his furlough, approved for 5:00 p. m., until about 8:00 p. m. The Center official refused plaintiff's request for the early pass.

His request having been initially denied, plaintiff telephoned, successively, the offices of Robert M. Landon, Director of the Division of Adult Services, Virginia Department of Corrections, and of A. T. Robinson, Regional Superintendent of the Southern Correctional Units, attempting to obtain permission for the early pass. Plaintiff was unable to reach Landon or Robinson, but defendant Jordan, the Regional Superintendent of Work Release for the Southern Correctional Units, did return plaintiff's call. Plaintiff explained his request to Jordan, who stated that if plaintiff had not previously made special arrangements for leaving early his request would be denied. Plaintiff thereupon responded, "I am tired of chickenshit rules and will do my future communicating to the newspapers and TV." Jordan then asked plaintiff if he was aware of the identity of the person to whom he was speaking and warned him to weigh his actions in terms of his future participation in the work-release program. According to

plaintiff's affidavit, Jordan further stated that "you (plaintiff) can be removed from the program." (Plaintiff's Affidavit, at 2). Plaintiff then asked whether Jordan was threatening him and, before Jordan could answer, plaintiff hung up the phone.

Jordan immediately called one Caudill, an officer at the Pre-Release Center, and instructed him to prevent plaintiff from leaving on his furlough. Jordan told Officer Caudill that he (Jordan) was proceeding to the Center to charge plaintiff with an institutional offense on account of plaintiff's behavior on the telephone. Jordan arrived at the Center at approximately 6:00 p. m. and met with plaintiff and defendant John V. Taylor. Taylor was Superintendent of the Center. Jordan questioned plaintiff and informed him that he was charging him with the institutional offense of "Using Vulgar or Insolent Language Toward an Employee or Non-Inmate." This conversation took place in Taylor's presence. The offense is classified in the prison regulations as a "Category C" infraction—a minor violation. Jordan also informed plaintiff that he was placing him on "administrative hold," which meant that plaintiff was confined to the Center (but not to his dorm or cell) pending disposition of the charges. Jordan also officially cancelled plaintiff's furlough. The institutional charge was officially served upon plaintiff at approximately 7:00 p. m. the same night by Officer S. E. Harrison, who was on duty that night at the Center.

Shortly after Officer Harrison had served plaintiff, Taylor instructed Harrison to refer the charge to him (Taylor) for disposition. A hearing on the charge was held before Taylor on 26 October, and Taylor listened as Jordan and plaintiff gave their versions of the 22 October telephone conversation. Plaintiff was allowed to question Jordan. Taylor found plaintiff guilty

---

1. The facts are based largely upon plaintiff's complaint and affidavit. Any discrepancies between the versions of the events of October 22 between the defendants and plaintiff are immaterial. For instance, defendant Jordan claims that plaintiff used the phrase "chickenshit people and chickenshit rules" over the phone.

Plaintiff swears that he used "chickenshit" only once, in reference to rules rather than people. Plaintiff's version is accepted as true for the purposes of this memorandum, as the result reached by this Court would be the same under either plaintiff's or defendants' versions.

of the offense charged and sentenced him to ten days quarters restriction, suspended upon the condition of thirty days good behavior. Plaintiff appealed Taylor's decision to G. A. Reynolds, Superintendent of the Southern Correctional Units, who affirmed the decision. Plaintiff never served the ten days quarters restriction, but between 22 October and 26 October he lost two days of employment and he lost his weekend furlough. Had plaintiff been able to work the two days he missed, he would have earned a total of $112.00. Plaintiff requested of defendants that his 22 October furlough be re-instated but this request was denied, although plaintiff did apply for and receive weekend furloughs in November and December, 1976 and in January, 1977.

Plaintiff claims that the above facts describe three violations of his constitutional rights. First, he claims that the cancellation of his furlough, the two days suspension from participation in the work-release program and the disciplinary action which was imposed directly on account of the language he used on the phone to Jordan violated his rights to free speech as guaranteed by the First and Fourteenth Amendments to the Constitution. Second, plaintiff claims that the cancellation of his furlough and placement on administrative hold which deprived him of two days work, without prior notice and a hearing, denied him of his right to Due Process of Law under the Fourteenth Amendment to the Constitution. Third, plaintiff claims that he was denied a hearing before the "Officer in Charge," as guaranteed for minor violations by Division Guideline 861, § VI(B)(4)(b), and that this also constituted a denial of Due Process of Law. For these alleged wrongs plaintiff seeks damages and declaratory and injunctive relief.

### I

■ In considering plaintiff's free speech claim this Court resorts to pronouncements of the Supreme Court which establish the perspective for analysis of claims of inmates under the Constitution. Recognition of the fact that prisoners, by virtue of their confinement, do not and cannot enjoy to the full extent the rights and privileges accorded free citizens has been longstanding. Thus, in *Price v. Johnston*, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948) the Court declared that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* at 285, 68 S.Ct. at 1060. More recently, in *Jones v. North Carolina Prisoner's Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the Court stated that:

> Prisons, it is obvious, differ in numerous respects from free society. They, to begin with, are populated, involuntarily, by people who have been found to have violated one or more of the criminal laws established by society for its orderly governance. In seeking a mutual accommodation between institutional needs and objectives [of prisons] and the provisions of the Constitution that are of general application, this Court has repeatedly recognized the need for major restrictions on a prisoner's rights. These restrictions have applied as well where First Amendment values were implicated. (quotation marks and citations omitted).

*Id.*, at 129, 97 S.Ct. at 2540.

More particularly, the validity of the restrictions which are to be imposed is to be determined in light of the objectives of the penal system:

> In the First Amendment context . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

> An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal of-

fenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses. This isolation, of course, also serves a protective function by quarantining criminal offenders for a given period of time while, it is hoped, the rehabilitative processes of the corrections system work to correct the offender's demonstrated criminal proclivity. Thus, since most offenders will eventually return to society, another paramount objective of the corrections system is the rehabilitation of those committed to its custody. Finally, central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves. It is in light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners.

*Pell v. Procunier*, 417 U.S. 817, 822–23, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

Additionally, Courts are to accord prison officials a measure of deference in assessing the constitutionality of an alleged interference with prisoner's First Amendment rights. This is no more than a recognition that courts are inexpert in and ill equipped to deal with matters of prison administration. *Jones*, 97 S.Ct. 2532; *Pell*, 417 U.S. at 826–28, 94 S.Ct. 2800; *Procunier v. Martinez*, 416 U.S. 396, 405–6, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

The framework for evaluating claims of inmates to the protections of the First Amendment—that penal authorities are to be allowed some latitude in imposing reasonable restraints on First Amendment activities for the purpose of accomplishing legitimate penological goals is demonstrated in recent Supreme Court decisions. In *Pell*, a prohibition of face-to-face interviews between inmates and newsmen at a California state prison was attacked. The Court upheld the prohibition, emphasizing the alternative means of communicating to the outside world that were available to inmates—the mails and contacts permitted with family and friends. Furthermore, prison officials, the Court found, had determined that permitting contact with family and friends, but not with newsmen, best served the goal of rehabilitation without unduly threatening internal security.

This determination was "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell*, 417 U.S. at 827, 94 S.Ct. at 2806. Thus, in *Pell* the prison-imposed restraint on speech was upheld because the Court found it to be a reasoned response by expert judgment in pursuit of legitimate penal objectives.

*Jones v. North Carolina Prisoners' Union* involved, among other regulations, a ban against inmate-to-inmate solicitation of membership in a prisoners' union. Although pure speech rights were not directly implicated, the Court's approach is consistent with *Pell* in that the prison ban was held constitutional because it was "reasonable, and . . . consistent with the inmates' status as prisoners and with the legitimate operational considerations of the institution." *Jones*, 97 S.Ct. at 2540.

In considering plaintiff's free speech claim this Court must also take account of the nature of the speech involved. The protection of the First Amendment varies with the kind, nature and purpose of the speech sought to be protected, and it has long been accepted that some speech may claim no or only partial protection. Thus, there is no right to speak "fighting words," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); or words that are maliciously libelous, *Linn v. United Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); or words that are "of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

Application of these principles yields a clear result in this case. Plaintiff was punished for using "vulgar or insolent language" toward defendant Jordan over the telephone. Plaintiff, it is clear, was not punished for voicing discontent with the administration of the prison. Had he refrained from using indecent, obscene language plaintiff would not have come within the prohibition of the regulation under which he was disciplined. Rather, plaintiff was punished for conveying his message in terms and in a manner which the prison officialdom has, through the regulation, found to be inconsistent with the goals of the penal system.[2]

Requiring inmates, who are incarcerated because they have at least once manifested disrespect for order and discipline, to comport themselves in a decent, mature and civil manner seems clearly relevant to achieving fundamental penal objectives— internal order and security, and rehabilitation. At least it certainly cannot be said that the judgment manifested in the punishment in this case, of "vulgar and insolent" language, is unreasonable and beyond the range of discretion properly allowed to State prison administrators under the Constitution. Moreover, plaintiff's vulgar outburst upon being thwarted in his desire to get off early on a Friday afternoon merits scant protection under the Constitution. Whatever value there may have been in this kind of "speech" is outweighed by considerations motivating the defendants in preserving order and discipline and in promoting decent and civil behavior from the incarcerated.

## II

■ Plaintiff argues that his right not to be deprived of liberty or property[3] without due process of law was violated when defendant Jordan summarily cancelled his furlough and placed him on administrative hold, with the result that he missed two days of work. Plaintiff claims that he had a right to the furlough and to participation in the work-release program which could not, consistently with the Fourteenth Amendment, be denied to him without prior notice and a hearing. In assessing this claim the initial step is to determine whether plaintiff's interests constituted "liberty" or "property" within the meaning of the Due Process Clause of the Fourteenth Amendment. Because this Court concludes that plaintiff's interests were not liberty or property within the meaning of the Due Process Clause there is no need to move on to the second step in the Due Process analysis—whether the process invoked by Jordan was "due."

■ The magnitude of plaintiff's loss of his furlough and wages from the work-release program in the quantitative sense is not the essential factor in determining whether that loss was of constitutional dimension. It is the nature rather than the weight of the interest that is critical under the Due Process Clause. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The notion that "any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause" has been rejected. *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976).

There clearly is no right under the general provisions of the Constitution itself for prisoners to participate in furlough and work-release programs, and plaintiff does not maintain otherwise. *Brooks v. Dunn*, 376 F.Supp. 976 (W.D.Va.1974); *Guthrie v. Oliver*, No. 73–434–r (E.D.Va. Nov. 5, 1974). Plaintiff's constitutional claim must therefore rest upon an alleged State created right or expectation that prisoners are entitled to participate in such programs and that such participation is to be forfeited

---

2. This Court has previously indicated the appropriateness of prison regulations which are aimed at promoting and securing civil behavior from inmates. *Landman v. Royster*, 333 F.Supp. 621, 656 (E.D.Va.1971).

3. Presumably plaintiff claims that both his liberty and property interests were implicated by Jordan's actions in that by missing two days of work he lost $112.00 in wages.

only upon certain conditions. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). This Court must therefore turn to an examination of applicable State law.

Section 53–37.1 of the Virginia Code concerns prisoner furloughs.[4] The language of the statute is permissive:

(a) The Director may, subject to such conditions as he may prescribe, extend the limits of confinement of any inmate in any institution subject to his authority to permit him a furlough under the provisions of this section for the purpose of visiting his home or family.

Subsections (c) and (d) of the furlough statute provide that a prisoner who fails to remain within the territorial limits of his furlough or to return to the prison within the time prescribed shall be deemed to have "escaped" and be subject to the penalties therefor, and shall have committed a misdemeanor. Section 53–37.2[5] provides that an inmate who is convicted of a major crime committed while on a furlough shall be ineligible for further furloughs.

The plain language of the State statutory provisions on furloughs reveals neither an inmate right to receive a furlough nor to be free from revocation of a furlough that has been granted save under certain conditions. Furloughs are left to the discretion of the Director of the Department of Corrections subject to such conditions as he may prescribe. Plaintiff has not asserted the presence of any regulations promulgated under this statute by the Director that circumscribe the discretion plainly conferred by the statute.

Section 53–37.2 does mandate that inmates who have committed major crimes while on furloughs shall not be granted additional furloughs, but this does not amount to a command that furloughs are to be denied or revoked only in such cases. The contrast with the statutes considered by the Supreme Court in *Wolff* is clear. In *Wolff*, in which the Court held that Nebraska had created a right on behalf of inmates not to be punished by loss of good-time credits except upon a finding that they had seriously misbehaved, there was a clear statutory right to good-time:

(1) The chief executive officer of a facility *shall* reduce, for parole purposes, for good behavior and faithful performance of duties while confined in a facility the term of a committed offender . . . .

*Wolff*, 418 U.S. at 546 n. 6, 94 S.Ct. at 2970 (emphasis added)

4. Section 53–37.1 provides in full:

(a) The Director [of the Department of Corrections] may, subject to such conditions as he may prescribe, extend the limits of confinement of any inmate in any institution subject to his authority to permit him a furlough under the provisions of this section for the purpose of visiting his home or family. Such furlough shall be for a period to be prescribed by the Director or his designate, in his discretion, not to exceed three days in addition to authorized travel time. The Department shall promulgate rules and regulations governing extension of limits of confinement hereunder.

(b) The Director may, when feasible, require the inmate or his relatives to bear the travel expense required for such visit or a prescribed portion thereof. Such travel expense shall include all amounts necessarily expended for travel, food and lodging of such inmate and any accompanying personnel of the Department during such furlough, and a per diem amount set by the Director to reimburse the Department for furnishing custodial personnel.

(c) Any inmate who willfully fails to remain within the limits of confinement set by the Director hereunder, or who willfully fails to return within the time prescribed to the place designated by the Director in granting such extension, shall be guilty of an escape and shall be subject to penalty as though he left the institution itself.

(d) Any inmate who without authority or without just cause fails to remain within the limits of confinement set by the Director hereunder, or who without authority or without just cause fails to return within the time prescribed to the place designated by the Director in granting such extension, shall be guilty of a Class 2 misdemeanor.

5. Section 53–37.2 provides in full:

Any inmate who is convicted of a felony included within the provisions of chapter 4 (§ 18.2–30 *et seq.*) of Title 18.2 or arson, burglary, or robbery, committed while on administrative furlough, shall, after conviction therefor, be ineligible for further furlough during the remainder of the sentence or sentences imposed upon him prior to furlough.

Nebraska had also clearly limited the circumstances under which this right to good-time could be forfeited:

> (2) Except in flagrant or serious cases, punishment for misconduct *shall* consist of deprivation of privileges. In cases of flagrant or serious misconduct, the chief executive officer may order that a person's reduction of term . . . be forfeited . . . (emphasis added). *Id.* at 545 n. 5, 94 S.Ct. at 2969.

The same discretionary theme found in the Virginia furlough program pertains to inmate participation in work-release programs. Section 53–38 [6] provides in pertinent part:

> . . . the Director is authorized to establish work release programs subject to such rules and regulations as the Board may prescribe, whereby a convict who is proficient in any trade or occupation, whom the Director is satisfied is trustworthy, may be approved for employment by private individuals, corporations or State agencies at places of business, or whereby a convict whom the Director is satisfied is trustworthy and capable of receiving substantial benefit from educational and other related community activity programs that are not available within a correctional institution may attend such programs outside of the correctional institution.

As with the furlough statute, the provisions on work-release make transgression by the inmate of the territorial limits set down for

---

6. Section 53–38 provides in full:

While convicts are employed in any work on the public grounds or property outside of correctional institutions, they shall be attended and supervised by a sufficient guard and shall be subject to the orders of such guard; provided, however, that the Director is authorized to establish work release programs subject to such rules and regulations as the Board may prescribe, whereby a convict who is proficient in any trade or occupation, whom the Director is satisfied is trustworthy, may be approved for employment by private individuals, corporations or State agencies at places of business, or whereby a convict whom the Director is satisfied is trustworthy and capable of receiving substantial benefit from educational and other related community activity programs that are not available within a correctional institution may attend such programs outside of the correctional institution, without guard during any hour of the day or night; provided further, that such convict must travel directly to, from or be in authorized attendance or employment at such place of business, educational or related community activity program. The Board may prescribe such rules and regulations as may be required for programs of work release on projects in which the government of the United States is a participant. The Director is authorized to arrange for the temporary care of convicts who are deemed capable of participation in the programs established herein in approved halfway houses established under § 53–128.6, as he deems proper. The hours of employment or attendance shall be arranged by the Director. The compensation for such employment shall also be arranged by the Director and shall be the same as those of regular employees in similar occupations. Any wages earned shall be paid to the Director, who, after deducting a sum sufficient to help defray the convict's keep and his pro rata share of the cost of administering and supervising the program, shall credit the balance to the convict's account or send it to his family, if the convict so chooses; with the express exception that, in the case of any person committed to the custody of the Director as a result of a conviction for nonsupport under the provisions of § 20–61, or in the case of any convict who has dependents receiving welfare benefits under any program administered by the Commonwealth or any political subdivision thereof, the Director shall have the authority to withhold from the earnings of the convict a portion for the support and maintenance of the convict's dependents. The amount of the portion withheld and its disposition shall be determined by the Director, subject to approval by the Board. Any convict who has been placed on any of the programs authorized herein shall, while outside the correctional institution or approved halfway house to which he is assigned, be deemed to be in custody whether or not he be under guard, and if he shall leave the area in which he has been directed to work or to attend educational or community activity programs, or the vehicle or route involved in his traveling to or from such place or program, he may be found guilty of escape as though he had left the correctional institution or approved halfway house itself.

Any inmate who without authority or without just cause leaves the area in which he has been assigned to work or to attend educational programs, or leaves the vehicle or route involved in his going to or coming from such place, shall be found guilty of a Class 2 misdemeanor.

886

participation in the program the equivalent of escape from the prison itself and a misdemeanor. Additionally, commission of a major crime while on a work-release program renders the inmate ineligible from future participation.[7] Plaintiff had no right to participate in a work-release program and no expectation that his participation could be terminated only under certain limited, defined conditions under the State statutory scheme regulating work-release.

In his complaint plaintiff had alleged that Jordan's order that he (plaintiff) be placed on administrative hold was equivalent to ordering him placed in pre-hearing detention. Pre-hearing detention, according to prison regulations,[8] may only be ordered when an inmate's behavior is considered to be dangerous to persons or property. If in fact plaintiff was placed in such detention there would be a serious question raised under the Due Process Clause, as such detention is apparently a form of isolation confinement. However, defendant Jordan, in his affidavit (Jordan Affidavit, at 3) states that administrative hold is not the equivalent of pre-hearing detention, in that in the former the inmate is merely restricted from leaving the grounds of the prison and does not involve segregated confinement. Plaintiff, in all the materials submitted to this Court subsequent to Jordan's affidavit, has not reasserted the pre-hearing detention claim and this Court finds that there is no dispute that administrative hold is not a form of such detention.

The prison regulations contain a provision that "[c]hanges in program assignment . . . are not to be used as penalties or punishment."[9] Plaintiff argues that the cancellation of his 22 October furlough and loss of two days work resulting from Jordan's actions constituted a "change in program assignment." This Court places a different interpretation on this regulation, and holds that the loss of one furlough (plaintiff has completed at least three furloughs since 22 October) and suspension (not cancellation) from a work-release program resulting in loss of two days work did not constitute "a change in program assignment."

Plaintiff's due process claim cannot be based upon the Supreme Court's holding in *Wolff*. In *Wolff* the Court made repeated references to the fact that punishment had been imposed for "serious misconduct." At 418 U.S. page 546, 94 S.Ct. 2963 the Court calls attention to the fact that it is not dealing with "punishment for misconduct" but punishment for "flagrant or serious misconduct." At page 547, 94 S.Ct. at page 2970, it again mentions "flagrant or serious misconduct," and it states that "[i]f the misconduct is less than flagrant or serious" lesser penalties are imposed. At page 549, 94 S.Ct. 2963, the Court notes that misconduct is classified in two categories: "Major misconduct" and "Minor misconduct." At page 554, 94 S.Ct. at page 2974, the Court holds that the federal district court had jurisdiction to hear a claim for damages "[attacking] the validity of the procedures employed for imposing sanctions, including loss of good time, for flagrant or serious misconduct." At page 557, 94 S.Ct. at page 2975:

> But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for *major misconduct*, the prisoner's interest has real substance and is sufficiently em-

7. § 53–38.1 (Cum.Supp.1977):
   Any person who is released from confinement for work release employment pursuant to the provisions of § 53–38, who is convicted of a felony included within chapter 4 (§ 18.2–30 et seq.) of Title 18.2 or arson, burglary, or robbery, committed while so released, shall, after such conviction, be ineligible for work release employment during the remainder of the sentence or sentences imposed upon him prior to his release for work release employment.

8. Commonwealth of Virginia, Department of Corrections, Guideline No. 861 (hereinafter cited as Guideline 861) (May 14, 1976, § VI(d)(2): "Pre-hearing detention is authorized only when the accused inmate's behavior is considered to be *dangerous to persons or property*." (Emphasis in original).

9. *Id.* § V(B)(7):
   Changes in program assignment and limitation on correspondence are not to be used as penalties or punishment.

braced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances . . . (emphasis added).

And at page 558, 94 S.Ct. at page 2976, the Court concluded that "[s]ince prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct" the Due Process Clause applies. Finally, the Court stated that its holding was applicable when the punishment imposed was confinement in isolation:

> The latter [isolation] represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct. Here, as in the case of good time, there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction. We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges. *Id.*, at 571 n.19, 94 S.Ct. at 2982.

It is clear, then, that the entire due process holding in *Wolff* was based upon a charge of serious misconduct which could result in severe punishment—loss of good-time or confinement in punitive isolation. Here, there was involved minor misconduct resulting in a loss of privileges in which, as

was seen above, plaintiff could claim no entitlement or right under applicable State statutes and regulations.[10] This Court is not inclined to extend the *Wolff* holding to such essentially discretionary matters of day-to-day prison administration.

This disinclination finds support in the recent case of *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) in which the Supreme Court held that inter-prison transfers of inmates did not implicate any liberty interest within the meaning of the Fourteenth Amendment's Due Process Clause. The Court emphasized that such transfers were matters traditionally and properly within the expert discretion of State prison officials. *Id.* at 225, 228–29, 96 S.Ct. 2532. Similarly, in this case a finding that defendants could not, consistently with the Constitution, revoke a single furlough and temporarily suspend participation in a work-release program without prior notice and a hearing would place the courts "astride the day-to-day functioning of state prisons and involve the judiciary in issues and discretionary decisions that are not the business of federal judges." *Id.* at 228–29, 96 S.Ct. at 2540. This Court therefore holds that defendant Jordan did not deprive plaintiff of any liberty or property interest under the Fourteenth Amendment when he summarily revoked his furlough and suspended him from participation in work-release.[11]

---

**10.** Anyone who has spent any time in the Navy (a restricted status but surely less restricted than that of a prisoner) knows that the loss of a weekend liberty rests in the discretion of a division officer or a commanding officer as a minor disciplinary procedure intended to correct minor disciplinary faults. There is usually no hearing, no charge, no impartial arbiter. The charge, hearing and judgment generally consists of "I've got work for you to do this weekend, Smith, go take off your liberty uniform and put your dungarees on."

**11.** This Court's holding that plaintiff had no liberty or property interest entitled to due process safeguards should not be taken as an implied finding that defendant Jordan's actions were not fundamentally fair. Indeed, it appears that the procedures employed by defendant Jordan were eminently fair and reasonable under the circumstances.

After plaintiff had hung up the phone, Jordan instructed the guard at the Pre-Release Center to prevent plaintiff from leaving on his furlough. Jordan arrived at the Center shortly thereafter and confronted plaintiff. After discussing the matter with plaintiff, Jordan officially cancelled his furlough and placed him on administrative hold pending disposition of the institutional charge Jordan decided to bring against plaintiff.

As the Supreme Court stated in *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961):

> The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. Due Process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. It is compounded of history, reason, the past course of decisions . . .

### III

■ Plaintiff's third claim attacks the validity of the disciplinary hearing held on 26 October 1977, in which defendant Taylor, the sole judge at the hearing, found plaintiff guilty of the offense charged and sentenced him to ten days quarters restriction, suspended on condition of thirty days good behavior. In his complaint plaintiff alleged .that this hearing violated the prison regulation concerning hearings on minor violation charges. The regulation [12] provides that the "officer-in-charge" during normal duty hours shall set the matter for an informal hearing before himself, in which the reporting officer and accused inmate present their versions of the facts. Plaintiff asserted in his complaint and in his motion for summary judgment that defendant Taylor deprived him (plaintiff) of his right to a hearing before the officer-in-charge by directing officer Harrison, who was on duty at the Pre-Release Center the night of 22 October to refer the charges to Taylor for a hearing. Plaintiff contended that the officer-in-charge was Harrison and not Taylor. However, in his brief in opposition to the United States Magistrate's proposed memorandum opinion of 22 July 1977 and in his brief responding to defendant's brief in opposition to plaintiff's summary judgment motion, plaintiff argues that the 26 October hearing was defective because defendant Taylor was biased. In support of this contention plaintiff refers to a prison regulation [13] which *prohibits* the officer-in-charge from serving on the Adjustment Committee (the prison disciplinary committee) which hears charges against an inmate.

Plaintiff is evidently confused as to the procedures followed by defendants in disciplining him. Under applicable prison regulations dealing with disposition of charges of minor misconduct (§ VI, (B), (4), Guideline No. 861, Department of Corrections), the officer-in-charge may schedule an informal hearing, at which he is to be the sole judge, and after listening to both the accused inmate and the reporting officer, render a judgment and impose a penalty. This informal procedure for minor violations is to be distinguished from the procedure employed for more serious alleged infractions of institutional regulations, when the function of the officer-in-charge is to refer the matter to the Adjustment Committee—the entity responsible for hearing charges of major misconduct. Prison regulations clearly prohibit an officer-in-charge from serving on an Adjustment Committee.

. . . As these and other cases make clear, consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.
Government deprivation of private interests admittedly entitled to protection under the Due Process Clause, in advance of a hearing, has been upheld when peculiar circumstances necessitated swift and sure action. *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); *R. A. Holman & Co. v. S.E.C.,* 112 U.S.App.D.C. 43, 299 F.2d 127 (1962), *cert. denied* 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962). Recently, the Supreme Court, in *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), rejected the argument that corporal punishment of school children without a prior due process hearing was violative of the Fourteenth Amendment. In so holding, the Court noted that to impose a prior hearing requirement would greatly undermine the use of such punishment as a disciplinary measure, and that any incremental benefit resulting from such a requirement would be outweighed by the cost in terms of interfering with the "comprehensive authority" of State officials over the administration of their schools. *Id.* at 680, 97 S.Ct. 1401.
The necessity for swift action and for preserving the control of State prison administrators over the conduct of inmates in the circumstances presented here is apparent. Had defendant Jordan been powerless to stop plaintiff from leaving immediately on his furlough then the community would have been subjected to the risk of having in their midst a prisoner whom prison officials had reason to believe was contemptuous of authority and discipline. This Court believes that defendant Jordan acted wisely and fairly, and in a manner well within the Constitutional standard of fundamental fairness, in detaining plaintiff pending disposition of official charges.

12. Guideline 861, *supra* note 8, § VI(B)(4)(b).

13. Id. at § VL(G)(4)(a).

It appears that the procedure followed in plaintiff's case was the informal procedure mandated for charges of minor misconduct. The 26 October hearing has been rather loosely referred to in some of the materials before this Court as an Adjustment Committee action. Regardless of the label attached to the hearing, this Court finds that plaintiff was not deprived of his right to due process of law by virtue of defendant Taylor's serving as the hearing officer.

■ Plaintiff's basic claim under either of the above interpretations of the 22 October hearing is that defendant Taylor was biased.[14] The Constitution does guarantee to an inmate a right to have a hearing before an impartial body when the possible punishment involves isolation confinement. *See Wolff*, 418 U.S. at 571, n.19, 94 S.Ct. 2963. Plaintiff's allegation of bias is based upon the fact that defendant Taylor was present when Jordan and plaintiff discussed the latter's behavior on the telephone the night of 22 October shortly after the telephone conversation occurred. This Court is at a loss to understand why the fact that Taylor heard both versions of the facts twice rather than once rendered the hearing at which he presided unfair under the Constitution.

It should be noted that various pre-trial proceedings in criminal prosecutions often witness damaging disclosures and accusations, yet the judge presiding over such proceedings is not thereby disqualified from presiding over the trial. Plaintiff's apparent contention that the Constitution sets higher standards of impartiality for prison disciplinary actions than criminal prosecutions is surely wrong.

An appropriate order shall issue.

## ON MOTION TO VACATE JUDGMENT

■ This matter is before the Court on plaintiff's motion of 21 November 1977, pursuant to Fed.R.Civ.P. 59(e),[1] to vacate the judgment entered by this Court on 10 November 1977 granting summary judgment for defendants and denying summary judgment for plaintiff.

Although plaintiff has labeled his motion a "Motion to Alter Judgment" allegedly pursuant to Rule 59(e), in actuality the plaintiff is moving the Court to reverse its order granting summary judgment to defendant and instead grant summary judgment to plaintiff or, in the alternative, grant plaintiff a trial of an allegedly disputed material fact.

The plaintiff in his brief brings forward no matter that could not have been argued before judgment was entered herein. His brief in support of his motion is no more than an expression of a view of the law contrary to that set forth in the Court's opinion. Whatever may be the purpose of Rule 59(e) it should not be supposed that it is intended to give an unhappy litigant one additional chance to sway the judge.

Since the plaintiff has brought up nothing new—except his displeasure—this Court has no proper basis upon which to alter or amend the order previously entered. The judgment may indeed be based upon an erroneous view of the law, but, if so, the proper recourse is appeal—not reargument.

This Court considers that no appropriate Rule 59(e) motion has been filed. Support for this holding may be found in *Erickson Tool Company v. Balas Collet Company*, 277 F.Supp. 226, 234 (N.D.Ohio 1967), *aff'd*, 404 F.2d 35 (6th Cir. 1968) wherein it was held that pleadings such as that filed by the plaintiff in the case at bar do not fall within the ambit of Rule 59(e). In *Erickson*

**14.** This Court's function under Section 1983 is to determine not whether defendants violated State law or regulation, but whether they violated the federal Constitution. A State may create substantive rights of such import that they are entitled to protection under the Due Process Clause. *Wolff*, 418 U.S. at 557, 94 S.Ct. 2963. However, this does not mean that all the procedures erected by a State to protect

these rights are thereby transferred into constitutional imperatives and that every irregularity in such procedures thereby offends due process of law.

**1.** Rule 59(e) of the Federal Rules of Civil Procedure states the following: "A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment."

the plaintiff requested the Court to make complete revisions or rewritings of its findings in such a manner that the amended findings would be completely contrary to the original findings made by the court. Essentially all the proposed amendments were previously embodied in proposed findings presented to and rejected by the court at the close of the trial. In denying the motion, the court stated the following:

> Plaintiff has also moved pursuant to Rule 59(e) of the Federal Rules of Civil Procedure for alteration or amendment of the Court's judgment. Plaintiff has not set out the alterations or amendments it desires. It appears, however, . . . that plaintiff is seeking a complete reversal of the Court's judgment. Such is not the purpose of the Rule relied upon. [277 F.Supp. at 234].

To the same effect and more directly on point is *Blair v. Delta Air Lines, Inc.*, 344 F.Supp. 367, 368 (S.D.Fla.1972). There the court held that Rule 59(e) was not intended to be a vehicle for obtaining post judgment reargument. In *Blair* plaintiff did not in fact seek to alter or amend the summary judgment but instead reasserted his original memorandum of law as basis for redetermination of issues decided by the judgment. The court in its holding stated that "[s]ince the plaintiff contends that the Order of this court is erroneous as a matter of law, the proper procedure is appeal to the United States Court of Appeals for the Fifth Circuit." 344 F.Supp. at 368.[2]

The Court notes that in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the United States Supreme Court held that the lower court erred in not granting petitioner's Rule 59(e) motion to vacate the court's order granting the opposing party's motion for summary judgment. The District Court there, however, was not asked to vacate its earlier order merely for the purpose of reconsidering the soundness of its holding but, instead, was asked to vacate its order so that the moving party could amend her complaint. This distinction is most crucial and, consequently, the holding lends no support to the issue now before the Court.

Accordingly, as no proper motion is pending before the Court under Rule 59(e), it is ADJUDGED and ORDERED that plaintiff's pleading of 21 November 1977 be, and the same is hereby DISMISSED.

2. *But see Sonnenblick-Goldman Corp. v. Nowalk*, 420 F.2d 858 (3rd Cir. 1970). Additionally, the Court is cognizant of its contrary holding in *American Fam. L. Assur. Co. v. Planned Mktg. Assoc., Inc.*, 389 F.Supp. 1141 (E.D.Va. 1974). There this Court held that "Rule 59(e) is available to a movant who seeks to have an order vacated." 389 F.Supp. at 1144. However, the peculiar procedural history in that case as well as the fact that the motion was made alternatively under Rule 60(b) make the decision less than satisfactory when applied to the factual situation found in the instant case.