OPINION OF THE COURT
Charles A. Kuffner, Jr., J.
Petitioner, an inmate confined at the Arthur Kill Correctional Facility in Staten Island, brings this CPLR article 78 proceeding to review a Hearing Officer’s determination after a disciplinary proceeding. Petitioner was the subject of a misbehavior report (7 NYCRR 251-3.1) filed by a correction officer. *630 That report accused petitioner of using obscene language on November 22,1989 outside the commissary window. Petitioner originally came to the commissary line at 12:30 p.m. and had asked how long it would be before he would be called. He was told to return in approximately 45 minutes. When petitioner returned at 1:50 p.m. the commissary line was apparently still crowded. Petitioner became loud and abusive, and yelled, “Why you tell me that shit, come back in an hour?”
Petitioner was accused of violating two institutional rules of conduct: (1) rule 104.13, which states that inmates shall not engage in conduct which disturbs the order of any part of the facility (7 NYCRR 270.2 [B] [5] [iv]); and (2) rule 107.11, which states that inmates shall not verbally or in writing harass employees or any other persons (7 NYCRR 270.2 [B] [8] [ii]). After a Tier II disciplinary hearing (7 NYCRR part 253), petitioner was found not guilty with respect to rule 104.13 but he was found guilty of violating rule 107.11 because of his use of the vulgarity “shit”.
Rule 107.11 states that verbal or written harassment "includes using insolent, abusive and/or obscene language and gestures”. Petitioner claims that the word “shit” is constitutionally protected speech under both the Federal and State Constitutions.
A uniform perspective for the analysis of claims of inmates under the Constitution has been established at both the Federal and State court levels.
The court in Durkin v Taylor (444 F Supp 879, 881 [1977]) acknowledged that "[Recognition of the fact that prisoners, by virtue of their confinement, do not and cannot enjoy to the full extent the rights and privileges accorded free citizens has been longstanding.”
It has been settled by the United States Supreme Court that a prison inmate "retains [only] those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.” (Pell v Procunier, 417 US 817, 822 [1974].)
Furthermore, the validity of restrictions imposed on a prisoner’s constitutional rights is to be determined in light of the objectives of the penal system (Pell v Procunier, supra, at 822-823).
When a prison regulation impinges on an inmate’s constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In Turner v Safley (482 US *631 78 [1987]), four factors were identified as particularly pertinent to a determination of the validity of prison regulations which impinge on inmates’ constitutional rights. First, whether there is valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it. Second, whether there are alternative means of exercising rights that remain open to inmates. Third, whether accommodation of asserted rights will have a significant "ripple effect” on fellow inmates or prison staff. Fourth, whether there is a ready alternative to the regulation that fully accommodates prisoners’ rights at a de minimis cost to valid penological interests.
State constitutional challenges to prison regulations require a balancing of the competing interests at stake. The importance of the right asserted and the extent of infringement are weighed against the institutional needs and objectives being promoted, with a measure of judicial deference accorded to the judgment of correction officers (see, Matter of Lucas v Scully, 71 NY2d 399 [1988]).
In People v Lewis (68 NY2d 923 [1986]), the court held that prison regulations will be upheld, giving due deference to the discretion and expertise of prison authorities, if the regulation furthers a substantial government interest in security and order and if the encroachment on constitutional rights is no greater than necessary to protect those interests.
Thus, petitioner’s claim must be analyzed in terms consistent with these State and Federal judicial determinations.
As noted in Durkin v Taylor (444 F Supp 879, supra), prisons differ in numerous respects from free society as they are populated by people who have been found to have violated one or more of the criminal laws established by society for its orderly government (see also, Jones v North Carolina Prisoners’ Union, 433 US 119, 129 [1977]).
Prison discipline, safety and prisoner rehabilitation must be considered in evaluating First Amendment rights. The court in Pell v Procunier (417 US 817, 822-823, supra) stated that the consideration of internal security within the correction facility is central to all corrections goals.
Rule 107.11 in its regulation of insolent and abusive language is rationally related to the legitimate security concerns of prison officials. The correction officer involved testified that he felt "harassed and threatened” by petitioner’s statement "Why you tell me that shit, come back in an hour”. Use of *632 such language in this context of expressing anger or frustration toward a correction officer constitutes potentially dangerous or threatening inmate activity. Thus, the regulation, as applied, bears a logical connection to the institutional interest in security in light of the concern that such behavior may have a significant ripple effect on other inmates or prison staff (see, Wolff v McDonnell, 418 US 539, 561-562 [1974]).
Petitioner’s use of the word "shit” was of such a nature as to potentially incite or provoke behavior on the part of inmates or prison staff inconsistent with the goals of order and safety. An accommodation of the use of such insolent and abusive language in the prison context would therefore be inconsistent with the legitimate goal of maintaining order and safety.
Petitioner has offered or pointed to no alternative regulation which would be more narrowly tailored to suit the concerns of the correction system and thus, has not shown that the prohibition of the word "shit” in the context in which it was used is not reasonably related to legitimate institutional goals.
There are no ready alternatives to rule 107.11 that could fully accommodate petitioner’s claim to a right to use the word "shit” in the context in which it was used. Moreover, regulation of the word "shit” does not deprive inmates of all speech rights. Only those inconsistent with the institutional objectives are affected. It is, therefore, wholly within the guidelines of the legitimate interests set forth that inmates be prohibited from using volatile, abusive and insolent language.
The court further recognizes the deference accorded officials of correctional institutions in matters such as this. In so doing, the court acknowledges the expert and special training prison officials possess with respect to the practical workings of the correctional facility.
Petitioner was punished for conveying his message in terms and in a manner which prison officials have found to be inconsistent with the goals of the penal system. Furthermore, such determination is within the province and professional expertise of the correction officials and in the absence of substantial evidence to indicate the officials had exaggerated their response, courts should ordinarily defer to their expert judgment in such matters (see, Pell v Procunier, supra).
*633 This court, therefore, gives substantial weight and consideration to the institutional reasons for promulgating rule 107.11 and presumes the institution officials found the apparent rational relation between the prohibition of insolent and abusive language and the institutional objectives of order, discipline and rehabilitation, a conclusion which is supported by the record. Furthermore, there existed alternative means for petitioner to have expressed his dissatisfaction with the manner in which his commissary privilege was handled. Petitioner had available to him a fair, orderly, simple and expeditious method of resolving his grievance. 7 NYCRR part 701 ("Inmate Grievance Program”) is intended to reduce conflict and is utilized to obtain resolution in instances such as the one at bar.
Petitioner’s claim bears a significant resemblance to the facts in Durkin v Taylor (supra). In that case a prisoner told a correctional system official that he was tired of "chickenshit rules” (supra, at 880). The court held that the inmate could be disciplined under a rule prohibiting "vulgar or insolent language” consistent with the First Amendment (supra, at 883).
This court adopts an analysis consonant with that utilized in Durkin v Taylor (supra), wherein a balance is sought between inmates’ rights and legitimate correctional objectives.
It is the opinion of this court that rules requiring inmates, who by virtue of their status, have previously manifested disrespect for order and discipline, to comport themselves in a decent, mature and civil manner, are clearly relevant to achieving fundamental penal objectives (see, Durkin v Taylor, supra, at 883).
What little communicative value there may have been in the petitioner’s insolent use of the word "shit” is outweighed by the considerations that prompted respondents in preserving order and discipline and in promoting decent and civil behavior from the incarcerated.
This court holds that respondent’s disciplinary action resulting from petitioner’s use of the word "shit”, in the context evidenced by the record, was neither unreasonable nor beyond the discretion vested in the prison authorities.
The petition is dismissed without costs and the clerk shall mail a copy of this order to the petitioner and respondent.