**RESOLUTION TRUST CORPORATION,**
Plaintiff,

v.

**Harry HOLMES, Jr., Thomas J. Holmes, Sr., Thomas J. Holmes, Jr., and John A. Hutchison, III, Defendants.**

Civ. A. No. H–92–0753.

United States District Court,
S.D. Texas,
Houston Division.

Nov. 29, 1993.

**450**

Lisa H. Pennington, Baker & Hostetler, Cynthia J. Thomson, Thomson & Solomon, Houston, TX, for plaintiff.

John L. McConn, Jr. McConn & Hardy, Houston, TX, Stephen E. McConnico Scott, Douglass & Luton, Austin, TX, for Harry Holmes, Jr. and Thomas J. Holmes, Jr.

Ted Hirtz, Houston, TX, for Thomas J. Holmes, Sr.

Robin C. Gibbs, Gibbs & Ratliff, Houston, TX, for John A. Hutchison, III.

## MEMORANDUM AND ORDER

LAKE, District Judge.

Defendants, Harry Holmes, Jr., Thomas J. Holmes, Sr., and Thomas J. Holmes, Jr. move for summary judgment (Docket Entry No. 152) because the claims of plaintiff, the Resolution Trust Corporation (RTC), are barred by application of the Texas two-year statute of limitations.

### I. Background

Defendants are former directors of the now failed Spring Branch Savings & Loan Association (Spring Branch). Spring Branch, as a state-chartered savings and loan association insured by the Federal Savings and Loan Insurance Corporation (FSLIC), was subject to concurrent regulatory oversight by the Texas Savings and Loan Department (TSLD) and various federal agencies. In late 1985 Spring Branch was seriously undercapitalized. When internal efforts to correct the problem through recapitalization proved inadequate, Spring Branch, acting through its board of directors, entered into a Consent Agreement with the FSLIC and the Federal Home Loan Bank Board (FHLBB) effective December 31, 1985, that required additional federal regulatory oversight.[1] On February 13, 1986, Spring Branch, acting through its board of directors, entered into an Agreed Order placing Spring Branch un-

---

1. The Consent Agreement is Exhibit 22 to the Appendix to Defendants' Motion for Summary Judgment (Docket Entry No. 154). None of the copies of the Consent Agreement submitted to the court contain either an execution date or an effective date. The only competent summary judgment evidence in the record points to an effective date of December 31, 1985. (Affidavit of Wayne Woodfin, Exhibit B to Brief in Support of Defendant John A. Hutchison, III's Motion to Dismiss Case for Failure to State a Claim [Docket Entry No. 18]) RTC argues, but offers no summary judgment evidence, that the Consent Agreement became effective on February 13, 1986. In any event the alleged difference in dates is not material to the court's analysis.

der voluntary supervisory control of the TSLD. The Agreed Order provided that a TSLD appointee, L.W. Grant, III, would serve as an on-site management and operations supervisor. On November 3, 1986, James M. Scurlock was substituted for Grant as supervisor. All of the efforts to revive Spring Branch failed, and on March 8, 1989, the FHLBB appointed the FSLIC as Receiver. On August 9, 1989, the RTC succeeded to the position of Receiver pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183 (1989). The RTC, in its corporate capacity, later purchased the assets of Spring Branch.

On March 6, 1992, the RTC, acting in its corporate capacity, initiated this action alleging that defendants were negligent,[2] grossly negligent, and breached their fiduciary duties of care and loyalty as directors of Spring Branch. The RTC's Second Amended Complaint (Docket Entry No. 64) clarified that the RTC also alleged a separate cause of action against defendant, Thomas Holmes, Sr., for breaches of his duties of obedience and care as an officer of Spring Branch.

In an August 7, 1992, Memorandum and Order (Docket Entry No. 43) the court held that the Texas two-year statute of limitations applied to all of RTC's causes of action against the defendants as directors.[3] The defendants and the RTC agree that all of RTC's claims arose more than two years before March 8, 1989, when FSLIC was appointed receiver of Spring Branch.[4] Thus, in the absence of circumstances that toll the statute of limitations, the RTC is barred from pursuing this action because all of the claims it asserts were time-barred when FSLIC acquired them. RTC argues that limitations were tolled because Spring Branch continued to be adversely dominated by the defendant directors during the period of federal and state regulatory supervision. Defendants argue that limitations were not tolled because the board of Spring Branch was not adversely dominated during the two-year period immediately prior to the appointment of the FSLIC as receiver. Alternatively, defendants argue that even if the board was adversely dominated, tolling is unwarranted because normal rules of corporate governance were abrogated when independent state supervisors were empowered to manage Spring Branch.

## II. *Summary Judgment Standard*

■ Summary judgment is warranted if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed.R.Civ.P. 56(c). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has pointed out the absence of evidence supporting the nonmoving party's case, the nonmoving party's failure to offer proof concerning an essential element of its case renders all other facts immaterial and mandates a finding that no genuine issue as to a material fact exists. *Saunders v. Michelin Tire Corp.,* 942 F.2d 299, 301 (5th Cir.1991).

■ Rule 56(c) requires the nonmoving party to go beyond the pleadings and show

---

2. The court has previously held that the business judgment rule as adopted and applied by Texas courts bars a simple negligence claim by RTC against a corporate director. (Memorandum and Order of August 20, 1992 [Docket Entry No. 43]) For purposes of defendants' limitations defense the court will assume that RTC has alleged a viable negligence claim against defendants.

3. The defendants' joint motion for summary judgment also seeks summary judgment in favor of Thomas Holmes, Sr., on RTC's claims against

him as an officer of Spring Branch. (Defendants' Motion for Summary Judgment, ¶ 12, Docket Entry No. 152) RTC does not dispute that the two-year statute of limitations also applies to this claim. (Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Docket Entry No. 169) ¶¶ 4, 14)

4. Compare Defendants' Motion for Summary Judgment (Docket Entry No. 152) at pages 2 and 3, with Plaintiff's Opposition (Docket Entry No. 169) at page 2.

by affidavits, depositions, answers to interrogatories, or admissions on file that specific facts exist over which there is a genuine issue for trial. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553. Although the non-movant's evidence is to be believed and all justifiable inferences will be drawn in the non-movant's favor, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), the non-movant may not rely on mere assertions, but must adduce admissible evidence creating a fact issue as to each essential element of the claim. *Matter of Lewisville Properties, Inc.,* 849 F.2d 946, 950 (5th Cir.1988). Conclusory affidavits will not suffice to create or negate a genuine issue of fact. *Reese v. Anderson,* 926 F.2d 494, 498 (5th Cir.1991); *Shaffer v. Williams,* 794 F.2d 1030, 1033 (5th Cir.1986).

In this case defendants bear the summary judgment burden on their affirmative defense of limitation. RTC can defeat summary judgment if it raises a genuine issue of fact as to whether the adverse domination of the Spring Branch board tolled limitations.

### III. *Adverse Domination*

In *Federal Deposit Insurance Corp. v. Howse,* 736 F.Supp. 1437, 1442 (S.D.Tex. 1990), this court adopted and applied the Texas version of the adverse domination rule. The court concluded that "[u]nder Texas law, a cause of action by a corporation against its directors does not accrue until a majority of disinterested directors have discovered or are put on notice of the cause of action." *Id.* at 1441. "'The rationale behind this theory is that the wrongdoers cannot be expected to bring an action against themselves.'" *Id.* (quoting *FDIC v. Hudson,* 673 F.Supp. 1039, 1042 (D.Kan.1987)). For that reason limitations periods are tolled until "'a new entity takes control of the bank, be it a receiver or a new board of directors [because only then] can suit against the wrongdoers be brought as a practical matter.'" *Id.*

**5.** Defendants hinge their argument on this agreement instead of the earlier December 31, 1985, Consent Agreement between the Spring Branch board and federal regulators because the court has previously found a consent agreement identical in terms to be insufficient to negate adverse

The court will first address defendants' alternative argument that even if the Spring Branch board was dominated by defendants, such domination was abrogated by the appointment of independent state supervisors. That argument has two facets: Did the state appointed supervisors have the power to sue the defendant directors for their allegedly wrongful conduct, and if so, did defendants nevertheless so dominate Spring Branch as to nullify the supervisors' authority to sue defendants? If defendants are successful on their alternative argument the court need not address their more fact intensive argument that they did not adversely dominate the Spring Branch board.

### A. *The Supervisors' Powers*

The RTC argues that prior to the appointment of the FSLIC as receiver on March 8, 1989, no "new entity" was in control of Spring Branch and therefore the board of directors still dominated the institution. Defendants argue that even if Spring Branch was adversely dominated by the board throughout this period, the statute of limitations began to run when the TSLD commissioner appointed a supervisor capable of overruling the board. Defendants argue that this occurred on February 13, 1986, when TSLD and Spring Branch entered the Agreed Order placing Spring Branch under voluntary supervisory control.[5] To succeed on this argument defendants must show that the authority of the state-appointed supervisors of Spring Branch under Texas law and pursuant to the Agreed Order gave the state supervisors sufficient power to negate the effect of defendants' alleged adverse domination.

The relevant statute states:

The board of directors of an association may consent to the commissioner's placing the association under supervisory control. The commissioner *may* appoint the supervisor and one or more deputy supervisors *who have* the powers of a conservator un-

domination. *Howse,* 736 F.Supp. at 1442–43. *But see Resolution Trust Corp. v. Kerr,* 804 F.Supp. 1091, 1094–98 (W.D.Ark.1992) (acknowledging that adverse domination could end with entry of Consent Order if factual circumstances support that finding).

der Section 8.08 of this Act and other powers established by agreement between the commissioner and the board of directors. The supervisory control continues until the problems giving rise to the supervisory control are corrected.

Tex.Rev.Civ.Stat.Ann. art 852a, § 8.11 (Vernon Supp.1993) (emphasis added). Defendants argue that under the plain meaning of this statute supervisors possess the powers of a conservator described in § 8.08, and that those powers include the ability to bring lawsuits against board members. Section 8.08(c) provides that a conservator "shall take necessary measures to preserve, protect, and recover the assets or property of the association, including claims or causes of action belonging to or that may be asserted by the association." The RTC replies that the language of § 8.11 does not mean what it says. Instead, the RTC argues that § 8.11 must be read "permissively." According to the RTC § 8.11 allows the commissioner discretion not only to appoint a supervisor incident to a voluntary supervisory agreement, but also the discretion to endow the supervisor with powers less than those conferred on a conservator by § 8.08.

█ The court is not persuaded by RTC's argument because the plain meaning of the statute contradicts RTC's interpretation. "May" as used in this statute only modifies the verb appoint. To accept RTC's argument the court would have to redraft § 8.11 to eliminate the words "who have" in the fifth line of the statute and replace them with the phrase "and may endow the supervisors with some or all of." The court agrees with defendants that the statute's use of the permissive "may" is restricted to the commissioner's overall choice to appoint a supervisor. Once the commissioner has done so § 8.11 vests the supervisor with both the powers of a conservator as described in § 8.08 and whatever additional powers are agreed to by the commissioner and the board of directors.

A comparison of the language of §§ 8.08 and 8.11 to analogous Texas statutes relating to banks and insurance companies illustrates that the Texas legislature was capable, should it have wished to do so, of differentiating between the powers it intended super-

visors and conservators to wield when it passed the Texas Savings and Loan Associations—Regulation and Supervision Act (Savings & Loan Supervision Act), 69th Leg., R.S., ch. 231 1985, May 25, 1985. In contrast to §§ 8.08 and 8.11, the statutes relating to banks and insurance companies employ a two-tiered procedure for taking regulatory measures to ensure the safe and speedy recovery or liquidation of a troubled institution.

When the Banking Commissioner or the Commissioner of Insurance decides that an institution has become or is in danger of becoming insolvent, the commissioner is required to issue written orders designed to rehabilitate the troubled institution. Tex. Rev.Civ.Stat.Ann. art. 342–801a, § 2 (Vernon 1973 & Supp.1993); Tex.Ins.Code Ann. art. 21.28–A, § 3 (Vernon 1981 & Supp.1993). To ensure compliance with those orders during the prescribed period of supervision the commissioners may appoint supervisors. The powers of such supervisors are less than those of conservators; for example, supervisors may not take measures, such as the filing of a lawsuit, to preserve the assets of a bank or insurance company. Tex.Rev.Civ. Stat.Ann. art. 342–801a, §§ 3 and 4 (Vernon 1973 & Supp.1993); Tex.Ins.Code Ann. art. 21.28–A, §§ 4 and 5 (Vernon 1981 & Supp. 1993). The banking and insurance commissioners may appoint conservators if (1) the institution fails to comply with the commissioner's orders during supervision, (2) is still unable to meet the statutory solvency and reserve requirements at the end of the supervisory period, or (3) if the institution consents. Once appointed, conservators are granted complete control over the failing institution. Tex.Rev.Civ.Stat.Ann. art. 342–801a, § 4 (Vernon 1973 & Supp.1993); Tex. Ins.Code Ann. art. 21.28–A, § 5 (Vernon 1981 & Supp.1993).

These statutory schemes are different from the one established by the Savings & Loan Supervision Act. Under that Act the commissioner may temporarily place a savings and loan association under a conservator without the consent of the association and without a hearing. § 8.05(a)(4). After a hearing that order may be made permanent. § 8.06. As an alternative to this procedure,

the commissioner and the board of directors of an association may agree, pursuant to § 8.11, to the appointment of a supervisor who has the powers of a conservator and any additional powers the commissioner and the board of directors agree to.

RTC relies on *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), to support its "permissive" interpretation of § 8.11. In *Gaubert* the Supreme Court held that the FHLBB's informal installation of supervisory personnel in a savings and loan, even though the relevant statutes provided only for formal proceedings, was within the "discretionary function" exception of the Federal Tort Claims Act (FTCA). The Court determined that the agency had the *discretion* to act informally because

> nothing in the language or structure of the statutes prevented the regulators from invoking less formal means of supervision of financial institutions. Not only was there no statutory or regulatory mandate which compelled the regulators to act in a particular way, but there was no prohibition against the use of supervisory mechanisms not specifically set forth in statute or regulation.

*Id.* 499 U.S. at 330, 111 S.Ct. at 1277.[6]

While *Gaubert* stands for the proposition that an agency possesses the discretion to deviate from a permissively worded statute if the method it ultimately employs is designed to achieve a statutorily permissible end, nothing in *Gaubert* permits an agency to deviate from the *mandatory* language of a statute such as § 8.11. Section 8.11 allows the commissioner and the board of directors of an association to negotiate for a supervisor

to have "other powers," not fewer powers. Because § 8.11 does not authorize the commissioner of the TSLD to appoint a supervisor with powers less than those dictated by the legislature in § 8.11 *Gaubert* is inapposite.

In addition to the substantial statutory authority afforded to the Spring Branch supervisors by § 8.11, the Agreed Order vested additional authority in the supervisors. The agreed order provided:

> Further, the Association's Board of Directors agrees that no meeting of the Board shall occur without written approval of the supervisor prior to the meeting (and the supervisor shall be allowed to attend *any such meeting)* and no action taken at any Board meeting will be valid or binding on the Association unless and until such action is approved in writing by the supervisor or the Commissioner.

This power is more extensive than that statutorily delegated to a conservator under § 8.08. The court concludes that the supervisors appointed under the February 13, 1986, Agreed Order between Spring Branch and the TSLD possessed the power to sue the defendants for their conduct complained of in this action.[7]

## B. *Dominance by the Board of Directors*

The conclusion that the TSLD appointed supervisors possessed the legal authority to sue the defendant directors of Spring Branch any time after the Agreed Order was entered on February 13, 1986, does not necessarily mean that the supervisors were free to *exercise* that authority in the face of an adversely dominated board. In *Howse* the court recognized that the summary judgment evidence presented to the court precluded finding as a

---

**6.** In *Gaubert* neither party cited any statutes or regulations governing the conduct complained of. The only relevant administrative determination was an FHLBB resolution giving itself the discretion to conduct itself in the manner it had based on its interpretation of the pertinent statutes. *Id.* 499 U.S. at 328–32, 111 S.Ct. at 1277–78.

**7.** Although in retrospect *Howse* is not as clear on this issue as the court would prefer, the court's discussion in *Howse* of the Voluntary Supervisory Control Agreement at issue in that case is not inconsistent with the court's conclusions in the

present case. Unlike defendants in this case, the defendants in *Howse* did not argue, nor did the court decide, what legal powers the Voluntary Supervisory Control Agreement gave the supervisory agent of Alliance Savings and Loan Association. In *Howse* the issue argued by the parties and addressed by the court was whether the defendant board members continued to exercise actual control over Alliance regardless of the *de jure* power of the supervising agent. The court did not discuss the state law powers of a supervisor under the Voluntary Supervisory Control Agreement. *Howse,* 736 F.Supp. at 1442.

matter of law that the adverse domination of a failed savings and loan had ended when a supervisor was placed in control. The supervisor's affidavit in *Howse* raised a genuine issue of material fact that the defendant members of the board "continued to exercise control over [the institution] and ... inhibit[ed the supervisor's] ability to conduct [the institution's] business." *Howse*, 736 F.Supp. at 1442. In *Durish v. Uselton*, 763 F.Supp. 192 (N.D.Tex.1990), Judge Robinson was faced with an analogous situation in the context of a failed insurance company. She concluded that adverse domination continued after appointment of a conservator who had the "authority and duty" to file suit against the wrongdoing directors, because there remained a "question of whether he was in fact wrongfully prevented from doing so...." *Id.* at 196 n. 7.[8]

To determine if the alleged adverse domination of the Spring Branch board nullified the state supervisors' power to sue the defendant directors the court must decide whether the supervisors could freely exercise their powers without being overridden by the adversely dominated board. The defendants' undisputed summary judgment evidence demonstrates that neither the initial supervisor, L.W. Grant, III, nor his successor, James M. Scurlock, was precluded from exercising his powers by the Spring Branch board.[9]

The summary judgment evidence shows that after Grant and Scurlock became supervisors they controlled litigation decisions of Spring Branch. During their tenure as supervisors Spring Branch filed numerous lawsuits without board approval. In addition, Grant overruled the board's decision to sue Spring Branch's auditors, and he overruled the board's decision to continue to prosecute another lawsuit and directed the board to ratify a settlement of the suit that he had made without board approval.[10] The RTC argues that this evidence merely shows that the supervisors had taken control of litigation concerning outstanding debts to Spring Branch. The RTC asks the court to find a qualitative difference between litigation decisions related to the every-day business affairs of the association and the ability to bring suit against directors and officers. Although the court might be willing to assume in the abstract such a distinction, in this case defendants have shown by undisputed summary judgment evidence that the state supervisors of Spring Branch had the unfettered power to make litigation decisions in all types of suits.

In the summer of 1986[11] Spring Branch filed an action styled *Spring Branch Savings & Loan Association v. Harry Holmes, Jr.*, No. 86-48276 in the 80th District Court of Harris County, Texas. Grant authorized the filing of the suit without seeking or obtaining board approval.[12] The idea for the suit came from the Federal Home Loan Bank of Dallas. A June 26, 1986, letter from the federal regulatory agency stated that "[t]he Board is directed to demand repayment and to initiate legal action to correct this situation should Director Holmes refuse to repay the interest."[13] On July 8, 1988, the petition was

---

**8.** This court reached a similar conclusion in *Federal Deposit Insurance Corp. v. Brown*, No. H–91–2073, 1992 U.S.Dist. LEXIS 21624 (S.D.Tex. Dec. 3, 1992). The court acknowledged that the board of the parent bank holding company had the power to initiate suits against the defendant directors and officers of Republic Bank–Houston. The court nevertheless concluded that the adverse domination rule continued to toll the statute of limitations because the defendants failed to demonstrate that the board of the parent company was likely to exercise that authority since the parent board was equally if not more responsible for the alleged wrongful conduct than the directors of the subsidiary bank.

**9.** The court has considered RTC's numerous objections to defendants' summary judgment evidence (Docket Entry Nos. 168 and 169 at p. 3).

In the discussion that follows the court has given no weight to evidence to which there has been a valid, or even an arguably valid, objection.

**10.** Deposition of L.W. Grant, III, pages 85–90; Deposition of Robert A. Hancock, pages 199–204, Exhibits 3 and 8 to Plaintiff's Opposition, Docket Entry No. 169.

**11.** The exact date is not in the record.

**12.** Grant Deposition at 49–50.

**13.** June 26, 1986, Letter from David Bradley to the Spring Branch Board, Exhibit 7 to RTC's Brief in Response to Thomas Holmes, Sr.'s Individual Reply Regarding Motion for Summary Judgment (Docket Entry No. 219) at p. 3.

amended to allege that defendant, Harry Holmes, Jr., breached his fiduciary duty as a director of Spring Branch by willfully and intentionally failing to return over $130,000 in interest that the association had mistakenly paid him. In the amended petition Spring Branch sought exemplary as well as actual damages against Holmes for this conduct.[14]

The RTC argues that the amendment to the suit merely indicates that the law firm hired at Grant's suggestion[15] amended the suit without seeking the board's or the supervisor's approval. According to the RTC to involve the board or the supervisor in such petty matters as amending a lawsuit previously filed to add new claims seeking punitive damages against a director for breach of his fiduciary duty would unrealistically involve the board in "microscopic oversight regarding an attorney's every tactical and procedural move."[16] This argument is contradicted, however, by Scurlock's testimony that the supervisors, in concert with the regulating agencies to whom they reported, routinely controlled the day-to-day decision-making for Spring Branch litigation.[17]

Moreover, RTC's argument is not persuasive even were it not contradicted by the record. The court is very skeptical that any competent lawyer, which the members of the law firm in question certainly are, would take it upon himself or herself to amend a complaint to sue a director of a client for breach of fiduciary duty and to seek punitive damages. The RTC meets itself coming and going with this argument. If, as RTC argues, a general appointment of legal counsel includes the authority to amend to sue a director for breach of fiduciary duty and punitive damages, one wonders, and the RTC never explains, why the power vested in the state-appointed supervisors under both art. 8.11 and the Agreed Order did not also include the power not only to file such a suit but to amend it in this manner. Furthermore, and perhaps most importantly, RTC's argument overlooks the critical fact that during the period when RTC argues that limitations should be tolled because of the adverse domination of the Spring Branch board, Spring Branch did sue one of its directors for the same type of conduct alleged in this action notwithstanding the alleged adverse domination of the board by the defendants. The importance of the 1986 suit and the 1988 amendment to it is not who authorized the suit and the amendment, but that the Spring Branch board was unable to prevent either.

The only evidence presented by RTC that the board ever inhibited the supervisors' control of Spring Branch comes from the declaration of Scurlock and the deposition testimony of his predecessor, Grant.[18] Scurlock's declaration is not capable of raising a genuine issue of material fact that the board interfered with his ability to utilize the authority granted to him because it does not address that issue. In his declaration Scurlock states that he was employed by the TSLD as supervisory agent of Spring Branch S & L from November of 1986 until March of 1989. After acknowledging that he had the powers granted by the board in the February 13, 1986, Agreed Order, Scurlock states:

> As a supervisory agent, I did not have the authority to sue directors or officers or to cause any lawsuit to be filed against anyone on behalf of Spring Branch, its stockholders or regulatory authorities.[19]

FSLIC gave the federal regulators the authority to bring suit on behalf of the association. Thus, the RTC's proffered discussion of that issue contained in the Declaration of David E. Bradley, the Supervisory Agent for the Federal Home Loan Bank in Dallas, Texas, responsible for federal oversight of Spring Branch, Exhibit 1 to Plaintiff's Opposition (Docket Entry No. 169), is inapposite to the discussion of the state-appointed supervisor's *de jure* and *de facto* authority.

---

14. Exhibit 24 to Defendants' Motion for Summary Judgment (Docket Entry No. 152).

15. Grant Deposition at 53.

16. RTC's Brief in Response to Thomas Holmes, Sr.'s Individual Reply Regarding Motion for Summary Judgment (Docket Entry No. 219) at p. 11.

17. *See, e.g.,* Deposition of James M. Scurlock, pages 52, 56–57, 61–64, Exhibits 31 and 34 to Appendix to Defendants' Motion for Summary Judgment (Docket Entry No. 154).

18. Defendants do not argue that the Consent Agreement between Spring Branch and the

19. Declaration of James M. Scurlock, Exhibit 2 to Plaintiff's Opposition.

Whether Scurlock had (or believed he had) the *authority* to sue directors and officers is irrelevant to the issue of whether the board of directors interfered with his ability to do so. Moreover, because Scurlock's affidavit merely states a conclusion unsupported by any facts, and is in fact contradicted by the facts, as explained at pages 458 to 459, *infra*, it is insufficient to raise a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Reese v. Anderson*, 926 F.2d 494, 498–499 (5th Cir. 1991).

Like Scurlock's declaration, the deposition testimony of his predecessor, Grant, on which RTC relies consists of conclusory statements that as a state-appointed supervisor he did not have the power to sue the defendant directors. As discussed above in connection with Scurlock, Grant's opinion as to his authority to sue is not relevant to the issue of the board's interference with the *exercise* of that authority.

The only evidence in the entire record that even suggests interference by the board of directors with the state-appointed supervisors is found in an earlier affidavit of Grant.[20] That affidavit cites two instances in which the board allegedly exerted its control over Spring Branch. However, it fails to raise a genuine issue of material fact that the board continued to dominate Spring Branch because the underlying factual assertions in the affidavit are either irrelevant to this issue or are negated by the deposition testimony of Grant and Scurlock and by the terms of the Agreed Order. Grant's affidavit states that one instance of continued board domination was the "Directors'" actions "contesting" the Consent Agreement. Whether the board initially contested the Consent Agreement or the Agreed Order, both of which the board ultimately approved, is irrelevant to whether the board attempted or was able to frustrate the activities of the supervisors appointed under the Agreed Order.

The other example of board domination cited in Grant's affidavit involved the suit against Harry Holmes, Jr., described above. According to Grant, after Holmes refused to return the interest overpayments he allegedly received from Spring Branch, Grant caused Spring Branch to file suit against him. Grant's affidavit states:

> Subsequent to my departure, he and his fellow Directors succeeded in passing a resolution to dismiss the case against him, after which Harry Holmes filed a Motion to Show Authority of Spring Branch to conduct the litigation. Spring Branch Savings later settled that case. However, this issue was indicative of the control the Board continued to exert over the association.

Ignoring the question of Grant's competence to testify about these matters, which occurred while Scurlock, not Grant, was the supervisor of Spring Branch, any probative value of this affidavit is eliminated by the other summary judgment evidence. The minutes of the board of directors meeting for December 17, 1986, reflect the following:

> On motion made by Harry Holmes, Jr., seconded by Helen Elliott, and unanimously approved, it was moved to drop the pending lawsuit against him, and to notify the attorneys that no further fees would be paid. James Scurlock, Supervisory Agent, overruled this decision by letter to Mr. Lee Morris, Supervisory Analyst of the Federal Home Loan Bank of Dallas, December 18, 1986, copy of which is made a part of the minutes.[21]

Thus, Grant's affidavit, while perhaps providing an example of *attempted* board domination, fails to support an inference that he or

---

**20.** RTC does not offer that affidavit in support of its opposition to the defendants' pending motion for summary judgment. RTC previously introduced the affidavit as its first unnumbered exhibit to its Memorandum of Law in Opposition to Defendant Hutchison's Motion to Dismiss Complaint (Docket Entry No. 29). Defendants have submitted that affidavit as Exhibit 41 to their Motion for Summary Judgment (Docket Entry No. 152).

**21.** Exhibit 12 to Plaintiff's Opposition, Docket Entry No. 169. Scurlock's deposition testimony quoted at pages 458 to 459, *infra*, illuminates in greater detail the events described in the minutes.

Scurlock was in fact unable to freely exercise the veto power over board action under the extra-statutory power expressly granted to him by the Agreed Order.

At his deposition Grant was given the opportunity to expand the list of specific instances contained in his affidavit. In response to defense counsel's request that he relate one instance in which the board of directors prevailed over the asserted will of the TSLD, Grant stated, "I don't recall any."[22] However, Grant was able to recall that he directed the board to take actions it disagreed with and to overrule actions taken by the board on a number of occasions.[23]

Grant's deposition contains the following colloquy:

Q. Let me ask you a hypothetical. If the [FHLBB] had said "You sue director "X" of Spring Branch," and the [TSLD] had said "You sue director "X," you would have sued director "X," would you have not?

A. I was an employee of [TSLD]. And had they requested me to do so, I would have done so.

Q. And you would have done so without a vote of the Board of Directors of Spring Branch?

A. If that's how they so directed me, that's correct. Let me go on to say, though, I am not expressing my view as to whether they had the authority at that time to bring certain actions against the Board. I'm just saying the answer to the question, if they directed me to do so, I would have done so.[24]

This is exactly what Grant testified happened with respect to the lawsuit that he caused to be filed against Harry Holmes, Jr.:

I do not see any reflection in the Minutes [of the board meetings] where the directors approved the filing of the[e] action against Harry Holmes.... [But, in] a letter I had sent to [one of the then directors of Spring Branch in response to his inquiry] ... I responded ... that I had been directed by the Federal Home Loan Bank [in Dallas] to commence that litigation and had retained Hughes, Watters to do so.[25]

This testimony negates any possible inference that the board of directors dominated Grant to the extent that he was unable to exercise the entire amount of his authority.

When Scurlock succeeded Grant in November of 1986 he too controlled litigation decisions of Spring Branch, and he brooked no interference from the Spring Branch board in exercising that authority. During Scurlock's deposition the following colloquy occurred:

Q. Specifically with respect to litigation brought by the institution, there's no question that the federal and state regulators, through you, the supervisory agent, controlled Spring Branch's litigation, correct?

A. Yes.

Q. And that control would extend to the questions of who to sue, when to sue them, and what to sue them for, correct?

A. Correct.

Q. And whether to settle with them and how much to settle for, correct?

A. Correct.

Q. And that control that you had—I say "you"; you and the federal and state regulators—had of the association's litigation included control over whether and when the institution would sue current or former members of Spring Branch's Board of Directors, correct?

A. Correct.

Q. If we turn over to page 2 of the minutes, in the last paragraph, did Harry Holmes, Jr., make a motion concerning Spring Branch's lawsuit against him?

A. Yes.

Q. From the minutes and from your memory, was the purpose of Mr. Harry

22. Grant Deposition at 94–95.

23. *Id.* at 85–90, 186–88.

24. *Id.* at 51–52.

25. *Id.* at 49.

Holmes, Jr.'s motion to get the association to drop the lawsuit against him?

A. Correct.

Q. And did the motion pass?

A. No.

Q. Well, didn't it pass the board, Mr. Scurlock?

A. It passed the Board, yeah.

Q. Unanimously, didn't it? So at that moment when it passed the board unanimously it became an official decision of the Spring Branch board of Directors unanimously passed, correct?

A. Correct.

Q. And the next thing that happened to it in the next moment is, it went away, correct?

A. Correct.

Q. Because you immediately overruled it, correct?

A. Correct.

Q. You overruled it at the meeting on the spot?

A. Yes.

Q. And the basis for your overruling that decision was that the authority to control the association's litigation, including litigation against current or former board members, was not vested in the board, but was vested in the federal and state regulatory authorities that you represented, correct?

MS. PENNINGTON:

Objection. Calls for a legal conclusion.

Q. Isn't that correct, Mr. Scurlock?

A. To my knowledge, that's correct.[26]

The inescapable conclusion is that despite their protestations to the contrary, both Grant and Scurlock exercised the power to take actions instituting and supervising litigation on behalf of Spring Branch without consulting the board and regardless of the board's attempted interference. No evidence

in the record supports a genuine issue of material fact that the board of directors wrongfully prevented the supervisors from exercising their extensive powers, which included the power to sue defendants for the conduct alleged against them in this action.

## IV. *Conclusion*

Because the court concludes that the RTC has failed to raise a genuine issue of material fact that the statute of limitations was tolled from the time of the appointment of Grant on February 13, 1986, and continuing throughout the period of supervision by his successor, Scurlock, Defendants' Motion for Summary Judgment (Docket Entry No. 152) is **GRANTED.**

### *FINAL JUDGMENT*

In accordance with the court's Memorandum and Order granting the Motion for Summary Judgment of defendants, Harry Holmes, Jr., Thomas J. Holmes, Sr., and Thomas J. Holmes, Jr. (Docket Entry No. 152), this action is **DISMISSED** with prejudice.

This is a **FINAL JUDGMENT.**

---

**26.** Deposition of Scurlock at pages 39–40 and 41–42; Exhibits 23 and 28 to Appendix to Defendants' Motion for Summary Judgment (Docket Entry No. 154). This testimony clearly shows that Scurlock, not the board, made litigation decisions for Spring Branch and that he had the power to resist any attempts by the board to interfere with that authority. Moreover, Scur-lock's testimony establishes that even if Grant's declaration and affidavit raised an issue of fact as to board interference with Grant's powers as a supervisor during his tenure from February 13 to November 3, 1986, they provide no evidence of interference with Scurlock during the almost two and one-half years of his tenure as a supervisor from November 3, 1986 to March 8, 1989.