**RESOLUTION TRUST CORPORATION, Plaintiff,**

v.

**Harry HOLMES, Jr., Thomas J. Holmes, Sr., Thomas J. Holmes, Jr., and John A. Hutchison, III, Defendants.**

No. H–92–0753.

United States District Court, S.D. Texas, Houston Division.

March 9, 1994.

Lisa H. Pennington, Baker & Hostetler, Cynthia J. Thomson, Thomson & Solomon, Houston, TX, for plaintiff.

John L. McConn, Jr., McConn & Hardy, Houston, TX, Stephen E. McConnico, Scott, Douglass & Luton, Austin, TX, for Harry Holmes, Jr. and Thomas J. Holmes, Jr.

Ted Hirtz, Houston, TX, for Thomas J. Holmes, Sr.

Robin C. Gibbs, Gibbs & Ratliff, Houston, TX, for John A. Hutchison, III.

## MEMORANDUM AND ORDER

LAKE, District Judge.

Pending before the court is the Amended Motion for New Trial of plaintiff, the Resolution Trust Corporation (RTC). (Docket Entry No. 236) RTC moves for a new trial pursuant to Fed.R.Civ.P. 59 based upon what it advances as newly discovered evidence and newly discovered law. RTC also argues that the court misinterpreted the facts and law when it concluded that all of RTC's claims were barred by the Texas two-year statute of limitations. Defendants, Harry Holmes, Jr., Thomas J. Holmes, Sr., and Thomas J. Holmes, Jr., respond that RTC's motion should be denied because (1) it was not served upon them within the time mandated by Rule 59, (2) RTC's allegedly newly discovered evidence and law do not meet the standard required by Rule 59, and (3) RTC's factual and legal arguments are meritless.

### I. Background

Although the factual and legal background of this case is detailed in the court's November 22, 1993, Memorandum and Order (hereinafter referred to as *M & O II*, reported at 839 F.Supp. 449), an abbreviated presentation of the facts is necessary to understand the court's resolution of RTC's motion. Defendants are former directors of the now failed Spring Branch Savings & Loan Association (Spring Branch). On December 30, 1985, Spring Branch, acting through its board of directors, entered into a Consent Agreement with the Federal Savings and Loan Insurance Corporation (FSLIC), acting under the direction of the Federal Home

Loan Bank Board (FHLBB). On February 13, 1986, the board entered into an Agreed Order placing Spring Branch under voluntary supervisory control of the Texas Savings and Loan Department (TSLD). The Agreed Order designated L.W. Grant, III, a TSLD appointee, as the on-site supervisor of Spring Branch. He was succeeded by James Scurlock on November 3, 1986. On March 8, 1989, the FHLBB appointed FSLIC as receiver.[1] On August 9, 1989, pursuant to passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA),[2] RTC succeeded to that position[3] and later transferred the assets of Spring Branch to itself in its corporate capacity.

On March 6, 1992, RTC, acting in its corporate capacity, initiated this action alleging that defendants were negligent, grossly negligent, and breached their fiduciary duties of care and loyalty as directors or officers of Spring Branch. In an August 7, 1992, Memorandum and Order (*M & O I*, 1992 WL 533256; Docket Entry No. 43), the court held that the Texas two-year statute of limitations applied to all of RTC's causes of action against the defendants and that the Texas business judgment rule barred a simple negligence claim by RTC against a corporate director.

The parties agreed that all of RTC's claims arose more than two years before March 8, 1989, when FSLIC was appointed receiver of Spring Branch. They disagreed, however, about whether the board of directors was adversely dominated, and, if so, whether the statute of limitations was tolled long enough for the claims to have survived until RTC brought suit. In *M & O II* the court held that the Texas statute of limitations barred all of the claims RTC asserted against defendants—including those based on negligence[4]—when RTC acquired them. Specifically, the court held that the state-appointed supervisors of Spring Branch possessed the statutory authority to bring suit against its directors. The court also held that RTC failed to meet its summary judgment burden to produce evidence negating the defendants' showing that the board of directors, even if adversely dominated, did not deter the state supervisors from exercising their extensive authority over Spring Branch. Accordingly, the court granted summary judgment in favor of defendants and entered a final judgment dismissing the action.

## II. *Characterizing RTC's Motion*

In *Lavespere v. Niagara Mach. & Tool Works, Inc.*[5] the Fifth Circuit addressed the differences between a motion to alter or amend a summary judgment under Rule 59(e) and a motion for relief from a summary judgment under Rule 60(b).

When a party files a motion for reconsideration of a summary judgment and submits in support of that motion eviden-

---

1. Although the Conservatorship Resolution attached as Exhibit 1 to the Appendix to Defendants' Motion for Summary Judgment (Defendants' Appendix; Docket Entry No. 154) appoints FSLIC as "sole conservator" the parties have consistently referred to this document as if it created a receivership. Since the two positions differ only in ways not relevant to any issue in this action, *see* 12 U.S.C. § 1821(d)(2), the court will generally refer to the two positions interchangeably.

2. Pub.L. 101–73, 103 Stat. 183 (1989) (codified in scattered sections throughout the Code, mostly in Title 12).

3. Many of FIRREA's provisions were effective immediately. Thus, for example, RTC was created and FSLIC abolished on August 9, 1989, by section 501(a), 103 Stat. at 369 (now codified at 12 U.S.C. § 1441a(b)(1)(A)) and 401(a)(1), 103 Stat. at 354 (*see* codification note after 12 U.S.C. § 1437 (Supp. I 1989)) of FIRREA. FHLBB

wound up its affairs during a 60–day transition period following enactment of FIRREA, pursuant to section 401(a)(2), 103 Stat. at 354 (*see* codification note after 12 U.S.C. § 1437 (Supp. I 1989)) of that Act. On August 9, 1989, RTC succeeded to the position of conservator or receiver "with respect to any institution for which [FSLIC] was appointed conservator or receiver during the period beginning on January 1, 1989 and ending on such date of enactment." FIRREA, § 501(a), 103 Stat. at 370 (formerly codified at 12 U.S.C. § 1441a(b)(6) (Supp I 1989)).

4. The court stated that "[f]or purposes of defendants' limitations defense the court will assume that RTC has alleged a viable negligence claim against defendants." *M & O II*, 839 F.Supp. at 451 n. 2.

5. 910 F.2d 167, 173–75, *reh'g denied with comments concerning unrelated issue*, 920 F.2d 259 (5th Cir.1990), *cert. denied*, —— U.S. ——, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993).

tiary materials that she failed to file on time, the extent of the court's discretion to reopen the case and to consider the materials depends, in the first instance, on the particular Federal Rule of Civil Procedure under which the motion arises.... A motion [for reconsideration] ... will be treated as either a motion "to alter or amend" under Rule 59(e) or a motion for "relief from judgment" under Rule 60(b). Under which Rule the motion falls turns on the time at which the motion is served.

*Lavespere*, 910 F.2d at 173. A party must *serve* a Rule 59 motion "not later than 10 days after entry of the judgment."[6] In *Harcon Barge Co., Inc. v. D & G Boat Rentals, Inc.*[7] the Fifth Circuit held that motions challenging the merits of a judgment that are not served by the tenth day following entry of the judgment must be treated as Rule 60(b) motions. While the ten day deadlines of Rule 59 are "jurisdictional and cannot be extended in the discretion of the district court,"[8] a party may move for relief from a judgment under Rule 60 "within a reasonable time"—ordinarily not exceeding one year from the time the judgment was entered. Fed.R.Civ.P. 60(b).

The final judgment in this action was entered on November 29, 1993. (Docket Entry No. 230) The deadline for timely service of a motion under Rule 59 was therefore Monday, December 13, 1993.[9] Because Rule 59 unambiguously requires that the motion be served not later than 10 days after judgment, courts have required strict compliance with Rule 5's

procedure for effecting service of pleadings and papers other than the initial complaint.[10] Defendants have submitted uncontradicted affidavits from their attorneys stating that service was first accomplished by personal service or by Federal Express on December 14, 1994—the eleventh countable day following the entry of judgment on November 29, 1994. The court therefore agrees with defendants that RTC's motion is untimely as a Rule 59 motion and may only be considered as a Rule 60(b) motion. Nevertheless, the court is mindful that strict application of Rule 59's service deadline appears harsh in this case because RTC's choice to utilize private delivery services was reasonably calculated to effect service more promptly than could be achieved through use of ordinary first class mail. The court will therefore also analyze RTC's motion under the Rule 59 standard.

### III. Is RTC Entitled to Relief Under Either Rule?

#### A. Standards of Review

In *Lavespere* the Fifth Circuit held that when deciding whether to exercise its discretion to reopen a case under Rule 59 to allow a party to introduce evidence not timely submitted, a court must balance the competing needs "to bring litigation to an end and ... to render just decisions on the basis of all the facts." 910 F.2d at 174. To do so,

the court should consider, among other things, the reasons for the moving party's

6. Fed.R.Civ.P. 59(b) (the ten-day time limit also appears in subsection (e) governing motions to alter or amend a judgment).

7. 784 F.2d 665, 669 (5th Cir.) (en banc), *cert. denied sub nom. Southern Pacific Transp. Co. v. Harcon Barge Co., Inc.*, 479 U.S. 930, 107 S.Ct. 398, 93 L.Ed.2d 351 (1986).

8. *Gribble v. Harris*, 625 F.2d 1173, 1174 (5th Cir.1980, Unit A) (citations omitted).

9. In computing this time the court excludes the entry date from consideration in all cases and excludes intermediate holidays and weekends whenever a rule establishes a time period of less than 11 days. Fed.R.Civ.P. 6(a). November 29, 1993, was a Monday, and the ten-day period ended on the second following Monday, December 13.

10. *See, e.g., Sinett, Inc. v. Blairex Laboratories, Inc.*, 909 F.2d 253, 253–54 (7th Cir.1990) (slipping motion under attorney's door after hours within time limit is insufficient to effect timely service). Rule 5 provides that service on a party's attorney becomes effective when delivered. Rule 5(b) defines delivery as

handing [the paper] to the attorney or to the party; or leaving it at the attorney's or party's office with a clerk or other person in charge thereof; or, if there is no one in charge, leaving it in a conspicuous place therein; or if the office is closed or the person to be served has no office, leaving it at the person's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein. Service by mail is complete upon mailing.

default, the importance of the omitted evidence to the moving party's case, whether the evidence was available to the non-movant before she responded to the summary judgment motion, and the likelihood that the nonmoving party will suffer unfair prejudice if the case is reopened.

*Id.*

Rule 60(b), while permitting greater time to move for relief, limits the avenues that provide access to such relief. A district court has discretion to provide relief from a final judgment under Rule 60(b) only if the judgment was entered in error as a result of "mistake, inadvertence, surprise, excusable neglect, newly discovered evidence or fraud; because the judgment is void or no longer deserving of prospective application; or for any other reason justifying relief." *Hill v. McDermott, Inc.*, 827 F.2d 1040, 1042 (5th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1052, 98 L.Ed.2d 1014 (1988). The burden of establishing at least one of these "exacting substantive requirements" is on the movant, and determination of whether that showing has been made is within the discretion of the court. *Lavespere,* 910 F.2d at 173–74.

## B. *RTC's Grounds for Relief*

RTC advances three grounds for reconsideration of the court's judgment: (1) the recent decision by the Texas Supreme Court in *Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937 (Tex.1993), clarifies the criteria to be used in determining whether the otherwise generally applicable Texas statutes of limitations had run against a state agency such as the TSLD; (2) the court's interpretation of the Texas Savings and Loan Act is flawed because it renders portions of the Act unconstitutional and for other reasons previously advanced by RTC; and (3) evidence discovered too late to be submitted before the court's ruling shows that (a) the board of Spring Branch was in fact adversely dominated and (b) the defendant board members were either negligent or grossly negligent and failed to perform their fiduciary

duties in such a manner that the business judgment rule should not shield them from liability.

1. *Did the statute of limitations run against RTC's claims while they were possessed by TSLD?*

■ The State of Texas and some of its instrumentalities are exempt from otherwise generally applicable Texas statutes of limitations. Tex.Civ.Prac. & Rem.Code Ann. § 16.061 (Vernon Supp.1994) ("A right of action of this state . . . is not barred by any of the following sections. . . ."). RTC contends that the Texas Supreme Court first announced criteria that clearly identified the TSLD as one of the instrumentalities entitled to this exemption two days after the entry of *M & O II.* Because *M & O II* held that the supervisor appointed by the TSLD had the power to bring suit against the former directors and officers of Spring Branch, RTC argues that a correct application of § 16.061 means that the TSLD's claims were still viable when FSLIC was appointed receiver on March 8, 1989. Under that scenario a federal limitations period would have commenced on March 8, 1989,[11] and this action would not be time-barred. The court is not persuaded by RTC's arguments.

While it is true that the recent decision in *Monsanto Co. v. Cornerstones Mun. Util. Dist.* clarifies the types of government agencies exempted from Texas statutes of limitations, *Monsanto* neither created new law nor clarified any issue germane to the court's judgment in this case. The fact that a TSLD-appointed supervisor could have brought the instant lawsuit against directors of Spring Branch does not mean that such a suit would have been entitled to the § 16.061 exemption as if TSLD had pursued a right of action belonging to the State of Texas. When the Federal Deposit Insurance Corporation (FDIC) acquires claims against former directors and officers of a failed national bank, "it is merely acquiring claims held by the failed bank."[12] To determine whether

---

11. *See FDIC v. Howse,* 736 F.Supp. 1437, 1444 (S.D.Tex.1990).

12. *FDIC v. Dawson,* 4 F.3d 1303, 1309 (5th Cir. 1993). *See also Fidelity & Deposit Co. of Maryland v. Conner,* 973 F.2d 1236, 1243 (5th Cir.

the statute of limitations had run when FSLIC acquired its claims against the defendant directors and officers the court must ask "whether the bank would be time-barred if it tried to sue its directors in state court on the date of the [FSLIC's] appointment as receiver."[13]

Without citing any authority RTC argues that the court should hold that limitations had not run against the TSLD on March 8, 1989, because the claims against the defendant directors and officers of Spring Branch became a right of action of the state when a state supervisor was first appointed in 1986. The court's independent analysis of Texas law satisfies it that RTC's position is unsound. In circumstances similar to this case the Texas banking commissioner is not exempt from otherwise applicable limitations periods when pursuing claims on behalf of a failed bank.[14] Section 8.11 of the Texas Savings and Loan Act[15] vests state-appointed supervisors with all the powers of a state conservator under § 8.08. The second sentence of § 8.08(f) states: "The conservator may file suit ... against any person for the purpose of preserving, protecting, or recovering assets or property of the association, including a claim or cause of action belonging to or that may be asserted by the association."[16] This statutory authority, which is similar to the authority of the banking commissioner in the cases cited in note 14, *supra,*

gives TSLD-appointed supervisors the right to bring suit on behalf of the association; it does not permit supervisors to recast a claim belonging to the association as a right of action belonging to the State of Texas. That the TSLD interpreted § 8.08(f) in this manner is evidenced by the fact that the action brought against Harry Holmes, Jr., in the 80th District Court of Harris County, Texas, at the behest of the TSLD supervisor for breach of fiduciary duties was not brought by the TSLD but by Spring Branch itself.[17] The court is therefore persuaded that § 16.061's exemption would not have prevented the action from being time-barred on March 8, 1989.

2. *Is the court's interpretation of the Texas Savings and Loan Act flawed?*

Section 8.11 of the Texas Savings and Loan Act, as it has existed throughout the time period relevant to this action, states in pertinent part:

The board of directors of an association may consent to the commissioner's placing the association under supervisory control. The commissioner may appoint the supervisor and one or more deputy supervisors who have the powers of a conservator under Section 8.08 of this Act and other powers established by agreement between

1992) ("In sum, the Bank owned the right to pursue certain claims directly against its directors. The FDIC-receiver succeeded to this right by statute, and the FDIC-corporate then succeeded to it by assignment."); *FDIC v. Wheat,* 970 F.2d 124, 130 (5th Cir.1992) ("[Courts] agree [that a] director's personal liability lies only to the entity that he or she represents.... [W]hen the FDIC operated as receiver, it stepped 'into the shoes' of the bank.").

13. *Dawson,* 4 F.3d at 1309.

14. *McNutt v. Cox,* 133 Tex. 409, 129 S.W.2d 626 (1939); *Shaw v. Bush,* 61 S.W.2d 526, 529 (Tex. Civ.App.—Waco 1933, writ. ref'd) ("[W]here the suit, although brought in the name of the government [by the banking commissioner, who is the head of an executive department of the state government], is for the use and benefit of private citizens [—the creditors of an insolvent bank—] the statutes of limitation apply in the same manner as though the suit had been brought in the name of the real parties in interest.").

15. The Texas Savings and Loan Act, originally passed as Acts 1963, 58th Leg., ch. 113, p. 269, is now codified as amended at Tex.Civ.Stat.Ann. art. 852a (Vernon Supp.1994).

16. The statutory language concerning a savings and loan conservator is also consistent with the fact that, with limited exceptions not applicable to this case, "the receiver of a [Texas] bank has no greater rights than the bank itself." Frank L. Skillern, Jr., *Closing and Liquidation of Banks in Texas,* 26 Sw.L.J. 830, 841 (1972).

17. Plaintiff's Original Petition, *Spring Branch Savings & Loan Association v. Harry Holmes, Jr.,* 80th District Court of Harris County, Texas, No. 86–48276, Oct. 17, 1986 (attached as Exhibit E to Brief in Support of Defendant John A. Hutchison, III's Motion to Dismiss Case for Failure to State a Claim, Docket Entry No. 18); Plaintiff's First Amended Original Petition, *id.,* July 8, 1988 (attached as Exhibit 24 to Defendants' Appendix; Docket Entry No. 154).

the commissioner and the board of directors.

In *M & O II* the court interpreted the first part of the second sentence as a grant of discretionary authority to the commissioner to appoint a supervisor and one or more deputy supervisors in connection with a voluntary supervisory agreement. The court interpreted the second part of the second sentence as a mandatory provision that each supervisor so appointed is statutorily endowed with all of the powers conferred upon a conservator by § 8.08 plus whatever "other powers" the commissioner and the board of directors agree that the supervisor shall have.

RTC argues that this interpretation is flawed for a number of reasons, some old and some raised for the first time in its amended motion for new trial. Despite the fact that neither a Rule 59 nor a Rule 60 motion provides the proper vehicle for rehashing old arguments[18] or advancing theories of the case that could have been presented earlier,[19] the court will address each of RTC's arguments for the sake of clarity of the record.

a. *The meaning of § 8.11*

■ RTC re-urges the court to adopt a more "permissive" interpretation of § 8.11. RTC interprets the word "may" to give the commissioner discretion not only to appoint a supervisor, but also to appoint supervisors with fewer powers than those of a conservator if he elects to do so. Section 8.11, however, says that once the commissioner chooses to appoint supervisors they "have the powers

of a conservator under Section 8.08 of th[e] Act." To arrive at RTC's interpretation the court would have to redraft § 8.11 to read: "The commissioner may appoint the supervisor[s] ... [and may endow the supervisors with some or all of] the powers of a conservator and other powers established by agreement between the commissioner and the board of directors." The court declines to accept RTC's invitation to judicially redraft this statute and adheres to its conclusion that RTC's interpretation is not supported by the text of § 8.11.

RTC also renews its argument that the court's interpretation renders § 8.11 meaningless. In *M & O II* the court painstakingly detailed the very real and meaningful effect of § 8.11. Absent § 8.11 the only statutory mechanism for placing a troubled savings and loan under the tutelage of a state regulator short of liquidation is that prescribed by § 8.05(a)(4) (under certain conditions the commissioner may temporarily place a savings and loan association under a conservator without the consent of the association and without a hearing) and § 8.06 (a temporary order creating a conservatorship may be made permanent after a public hearing). Conservatorship hearings pose a risk of diminished public confidence in a financial institution and the additional risk that the result of any hearing will be appealed through the time-consuming and expensive administrative process and finally to the courts. *See* Tex.Gov't Code Ann. § 2001.171 (Vernon Supp.1994) (providing for judicial review of administrative hearings after exhaustion of

---

**18.** *E.g., Blair v. Delta Air Lines, Inc.*, 344 F.Supp. 367, 368 (S.D.Fla.1972), *aff'd*, 477 F.2d 564 (5th Cir.1973) (neither Rule 59 nor Rule 60 provides an alternative avenue to pursuing an appeal when a party merely refiles its memorandum of law opposing a granted summary judgment motion); *Frito–Lay of Puerto Rico, Inc. v. Cañas*, 92 F.R.D. 384, 390 (D.P.R.1981) ("To the extent that the Motion for reconsideration merely reasserts legal arguments previously made ... all of which were carefully considered by the Court prior to its issuance of the Opinion and Order ... we hold that there is no reason to vacate the Court's earlier Opinion and Order."); *Durkin v. Taylor*, 444 F.Supp. 879, 889 (E.D.Va.1977) ("Whatever may be the purpose of Rule 59(e) it should not be supposed that it is intended to give an unhappy litigant one additional chance to sway the judge.").

**19.** *E.g., Quaker Alloy Casting v. Gulfco Industries, Inc.*, 123 F.R.D. 282, 288 (N.D.Ill.1988) ("Despite what [movant] appears to think, this Court's opinions are not intended as mere first drafts subject to revision and reconsideration at a litigant's pleasure.... [N]ew legal theories based on previously available information cannot be offered on a motion for reconsideration."); *Milwee v. Peachtree Cypress Inv. Co.*, 510 F.Supp. 284, 289–90 (E.D.Tenn.1978), *aff'd*, 644 F.2d 885 (6th Cir.1981) ("Motions [for new trial or amending a judgment] ... are not intended to be utilized to ... allow a party to present his case under a new theory; these motions are designed to correct manifest errors of fact or law or as vehicles to present newly discovered evidence.").

administrative remedies). "As an alternative to this procedure, the commissioner and the board of directors of an association may agree, pursuant to § 8.11 [without resort to issuing an order giving rise to the right to a public hearing], to the appointment of a supervisor who has the powers of a conservator and any additional powers the commissioner and the board of directors agree to." *M & O II*, 839 F.Supp. at 453–54. Far from rendering § 8.11 meaningless, the court's interpretation leaves intact a mechanism for early intervention in the operations of a troubled institution with reduced risk of harm to the rehabilitative effort by minimizing the likelihood of diminished public confidence and a lengthy contest for control by management.

RTC also argues that the court's construction of § 8.11 is flawed because "it is difficult to imagine the board and the agencies entering into a Consent Agreement and an Agreed Order to work together to save the institution and at the same time giving a supervisor the authority and mandate to sue the very individuals who voluntarily entered into that agreement."[20] But the commissioner always has the right to pursue a derivative suit if a savings and loan association fails to do so. Tex.Civ.Stat.Ann. art 852a, § 11.23 (Vernon Supp.1994) (commissioner can bring derivative suit in the right of an association provided he finds that the claim remains unpursued on the 31st day after the commissioner gives notice to the board). The Agreed Order and § 8.11 merely supplemented the commissioner's pre-existing right to pursue an action against directors and officers by authorizing a supervisor to act directly and immediately for the association. The court is not persuaded that directors will lose their incentive to cooperate in rehabilitative efforts merely because the commissioner's pre-existing power to bring suit will be augmented in this limited fashion if the directors enter an agreed order.[21] Furthermore, even if RTC's

argument had merit it is more properly addressed to the Texas Legislature.

Finally, RTC argues that the court misinterpreted the differences between the Texas Savings and Loan Act and the analogous Texas statutes relating to banks and insurance companies. The court is not persuaded by this argument. The court's statutory analysis is consistent with well recognized rules of statutory construction. *See, e.g., FDIC v. Belli,* 981 F.2d 838, 840 (5th Cir. 1993) (existence of specific language connoting a particular meaning in a statute suggests that Congress intended something different when Congress refrains from using identical language in a later drafted statute.). When contrasting the language found in the banking and insurance contexts on the one hand to the Texas Savings and Loan Act on the other to better understand the legislature's intent, the court was merely following the advice of the Texas Legislature: when construing Texas statutes one should consider "common law or former statutory provisions, including laws on the same or similar subjects." Tex.Gov't Code Ann. § 311.023(4) (Vernon Supp.1988).

### b. *Federalism and the dual system of banking*

█ RTC argues for the first time that the court's interpretation of the Texas Savings and Loan Act causes it to conflict with federal law and therefore to violate the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2. After reviewing the relevant federal statutes the court concludes that RTC has apparently misperceived the balance Congress achieved for the competing interests of federal regulatory agencies and the state as chartering authority in the supervision of federally-insured savings and loan associations.

In *M & O II* the court observed that "Spring Branch, as a state-chartered savings

---

**20.** Amended Memorandum in Support of Plaintiff's Amended Motion for New Trial (hereinafter referred to as "Support Memo;" Docket Entry No. 237 at 8 n. 4).

**21.** The Agreed Order also required the Spring Branch board to promptly approve any asset sale, merger, or other control transfer transaction recommended by the commissioner and to

become disenfranchised. (Agreed Order, attached as Exhibit 19 to Defendants' Appendix (Docket Entry No. 154)) The court views these obligations as much more onerous to potential signatories of agreed orders than removing procedural bars to pursuing a derivative action against them.

and loan association insured by the Federal Savings and Loan Insurance Corporation (FSLIC), was subject to concurrent regulatory oversight by the Texas Savings and Loan Department (TSLD) and various federal agencies." *M & O II*, 839 F.Supp. at 450. TSLD, as the chartering authority, was Spring Branch's primary regulator. To understand the relationship between TSLD and the federal regulatory agencies that exercised concurrent supervisory authority over Spring Branch it is first necessary to identify the relevant federal authorities. Spring Branch obtained federal deposit insurance from FSLIC pursuant to the pre-FIRREA version of the National Housing Act.[22] 12 U.S.C. §§ 1726(a) & (b) (1988) (repealed by FIRREA; FDIC now furnishes all federal deposit insurance to banks and savings and loan associations). By participating in FSLIC's federal insurance program Spring Branch became subject to a measure of federal regulation. For example, the National Housing Act mandated that any association applying for insurance had to agree to allow FSLIC to examine its books and operations.[23] Under the pre-FIRREA version of the Home Owners' Loan Act of 1933 [24] FHLBB was the chartering authority and primary regulator of federally-chartered savings and loan associations. 12 U.S.C. § 1464(a) (1988) (amended by FIRREA to place the Office of Thrift Supervision into that role). FHLBB also exercised some regulatory authority over state-chartered insti-

tutions in its capacity as the agency that operated and directed FSLIC.[25]

When Spring Branch began to have difficulties the federal authorities were the first to act. On December 30, 1985, FSLIC, acting under the direction of FHLBB, entered into a Consent Agreement [26] with the Spring Branch board of directors requiring Spring Branch to comply with strict loan and other activity guidelines designed to return the institution to solvency. The Consent Agreement recited that FSLIC was refraining from exercising the power provided by 12 U.S.C. § 1730(e) (1988) (repealed by FIRREA) to institute cease and desist proceedings, but that those proceedings were warranted by existing conditions and could be triggered by any violation of the Consent Agreement.[27] The Federal Home Loan Bank in Dallas was appointed FSLIC's Supervisory Agent to ensure and monitor compliance with the Consent Agreement and applicable federal law. On February 13, 1986, the TSLD supplemented this federal intervention by entering into the Agreed Order with the Spring Branch board of directors.[28] The Agreed Order invoked the authority of § 8.11 of the Texas Savings and Loan Act to appoint a state supervisor with the powers of a conservator under § 8.08. The federal regulatory agencies were aware that the state was placing a supervisor in charge of Spring Branch, and they actively cooperated with the state regulators and the state supervisors in the rehabilitative process.[29] Ultimately,

**22.** Act of June 27, 1934, ch. 847, 48 Stat. 1246 (1934) (now codified at 12 U.S.C. §§ 1701–1750jj).

**23.** 12 U.S.C. § 1726(b) (repealed by FIRREA) (applications for federal deposit insurance "shall contain an agreement (1) to pay the reasonable cost of such examinations as the [FSLIC] shall deem necessary...."). Additionally, as previously noted, Spring Branch became subject to cease and desist proceedings. 12 U.S.C. § 1730(e) (before repeal by FIRREA, this provision gave FSLIC power to institute proceedings against "any insured institution, institution which has insured accounts or any director, officer, employee ...").

**24.** Act of June 13, 1933, ch. 64, 48 Stat. 128 (1933) (now codified at 12 U.S.C. §§ 1461–1470).

**25.** 12 U.S.C. § 1725(a) (1988) (repealed by FIRREA).

**26.** Exhibit 22 to Defendants' Appendix at R602962 (Docket Entry No. 154) ("This Consent Agreement ... is made ... by and between Spring Branch ... and ... FSLIC ... which is under the direction of ... FHLBB.").

**27.** *Id.* at R602962, R602968, ¶ 18.

**28.** Exhibit 19 to Defendants' Appendix (Docket Entry No. 154).

**29.** *See, e.g.*, Letter from Federal Home Loan Bank of Dallas to Spring Branch Board of Directors, dated June 26, 1986, at R406636–R406645, attached as Exhibit 12 to Defendants' Appendix (Docket Entry No. 154) (containing numerous references to state appointed supervisor's remarks relating to matters of concern to the FHLBB in the rehabilitation process).

on March 8, 1989, the FHLBB chose to garner exclusive jurisdiction to appoint a conservator under 12 U.S.C. § 1729(c)(1)(B) (1988) (repealed by FIRREA) and appointed FSLIC as sole conservator of Spring Branch.[30]

RTC argues that throughout this sequence of events § 8.11 could not have allowed the TSLD to appoint a supervisor with the powers of a conservator under state law because federal law placed exclusive jurisdiction to appoint a "conservator" for Spring Branch, and any other state-chartered savings and loan that participated in FSLIC's federal deposit insurance program, in the FHLBB. For this remarkable proposition to which RTC devotes less than three pages of its Amended Memorandum, RTC cites portions of sentences extracted from provisions of the pre-FIRREA versions of the National Housing Act and the Home Owners' Loan Act. RTC's argument begins with fact. Section 5(d)(6) of the pre-FIRREA Home Owners' Loan Act, 12 U.S.C. § 1464(d)(6)(A), stated that FHLBB "shall have exclusive power and jurisdiction to appoint a conservator or receiver [for an association]."[31] Section 2 of the pre-FIRREA Home Owners' Loan Act, 12 U.S.C. § 1462(d) (1988), defined "association" to include only "Federal savings and loan association[s] or a Federal savings bank chartered by the [FHLBB under § 5(a), 12 U.S.C. § 1464(a)]." Section 5(d)(6) thus made FHLBB solely responsible for placing associations it chartered under the tutelage of a receiver or conservator.

RTC mistakenly argues that FHLBB's omnipresent, exclusive authority over federally-*chartered* associations extended to federally-*insured*, state-chartered associations. RTC argues that FSLIC's right to examine Spring Branch's books and operations as a condition to providing federal deposit insurance transformed Spring Branch into an "association" within the meaning of § 5(d)(6) of the Home Owners' Loan Act because the definition of "association" applicable to subsection (d) was modified to include any state-chartered savings and loan association over which "the [FHLBB] now or hereafter has any statutory power of examination."[32] From its cursory and incomplete review of this complex statutory scheme RTC urges the court to find that § 5(d)(6), 12 U.S.C. § 1464(d)(6) (1988), divested the TSLD of jurisdiction to appoint a "conservator" for Spring Branch throughout the relevant time period because of the Supremacy Clause.[33]

RTC has fundamentally misinterpreted the federal statutes it cites. Language that RTC mysteriously omits from the sentences it quotes refutes its arguments. Moreover, RTC compounds the confusion its reliance on misinterpretations and partial quotations creates by failing to properly identify the statute FHLBB actually used to place Spring Branch under federal conservatorship on March 8, 1989. According to RTC, the FHLBB invoked § 5(d)(6) when it appointed FSLIC conservator for Spring Branch on March 8, 1989.[34] In reality FHLBB could

30. The Conservatorship Resolution is attached as Exhibit 1 to Defendants' Appendix (Docket Entry No. 154).

31. This provision was amended and renumbered subsection (d)(2) by section 301 subsection 5 of FIRREA. *See* 103 Stat. at 290–293. It was further amended by the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. 102–242, § 133, 105 Stat. 2236, 2271–73 (1991).

32. Section 5(d)(14) of the Home Owner's Loan Act, 12 U.S.C. § 1464(d)(14) (1988) (amended and renumbered subsection (d)(5) by FIRREA).

33. RTC fails to clarify why even if its conclusion were correct the court would have to find that the Constitution forbade Texas from empowering the supervisor actually placed in control of Spring Branch to pursue state law causes of

action against the former directors and officers of Spring Branch.

34. RTC states that "FHLBB placed Spring Branch in receivership under the authority of section 5(d)(6)(A)(i) of the Home Owner's Loan Act with [sic] 1933, codified at 12 U.S.C. § 1464(d)(6)(A)(i), on grounds of insolvency." (Support Memo; Docket Entry No. 237 at 12 n. 7) As authority for this statement RTC cites "Exhibit 2 to the Motion for New Trial." Exhibit 2 to RTC's motion for new trial is the March 8, 1989, Conservatorship Resolution, which is also Exhibit 1 to Defendants' Appendix; Docket Entry No. 154. That document cites § 5(d)(6)(A)(i), but, as explained *infra*, this citation was only provided as evidence of satisfaction of the conditions precedent to federal intervention in a state-chartered savings and loan pursuant to § 406(c)(1)(B) of the pre-FIRREA National

not have acted pursuant to § 5(d)(6) of the pre-FIRREA Home Owners' Loan Act, 12 U.S.C. § 1464(d)(6), because that section did not provide FHLBB authority to appoint a federal agency as conservator or receiver for a state-chartered savings and loan association solely on the strength of its federal insurance application. Instead, FHLBB acted pursuant to § 406(c)(1)(B) of the pre-FIRREA National Housing Act, 12 U.S.C. § 1729(c)(1)(B) (1988) (repealed by FIRREA), when it placed Spring Branch under federal conservatorship on March 8, 1989.

Before FIRREA was enacted only § 406(c) of the National Housing Act, 12 U.S.C. § 1729(c) (1988) (repealed by FIRREA), provided authority for appointment of FSLIC as a state-chartered savings and loan institution's conservator or receiver by virtue of the institution's participation in federal deposit insurance. Under that statute FSLIC could be appointed conservator or receiver in one of three ways. None of them disturbed a state's concurrent jurisdiction to appoint a conservator or receiver until certain statutory conditions had been met.

Of the three mechanisms, the one provided in § 406(c)(1)(A), 12 U.S.C. § 1729(c)(1)(A) (1988) (repealed by FIRREA), resulted in the least disruption of concurrent state and federal regulatory control.

> Section 1729(c)(1)[ (A) ] authorizes the FSLIC to accept an appointment as state receiver for the purpose of liquidation if a state-chartered association is in default.... Under these circumstances section 1729(c)(1) vests the FSLIC with the same powers given it by section 1729(b) over federally chartered savings and loans,

Housing Act, 12 U.S.C. § 1729(c)(1)(B) (1988) (repealed by FIRREA).

**35.** 12 U.S.C. § 1464(d)(6)(A) lists five grounds sufficient to give rise to federal intervention in a federally-chartered savings and loan: (i) insolvency, (ii) substantial dissipation of assets or earnings due to violation of law, rules, or regulations, or due to unsafe or unsound practices, (iii) unsafe or unsound condition to transact business, (iv) willful violation of a final cease and desist order, and (v) concealment or refusal to produce books, records, or assets for an examination.

> subject to the regulation of the public authority that appointed it.

*Fidelity Sav. & Loan Ass'n v. FHLBB,* 689 F.2d 803, 808 (9th Cir.1982), *cert. denied,* 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983) (emphasis added). By acting as the State's appointed agent, the federal regulator obtained the ability under § 406(c)(1)(A) to participate in day-to-day regulation without interfering with state control of the institution.

Because the federal government must aggressively protect the federal deposit insurance fund, Congress also provided a remedy for the occasional disharmony that may arise between state and federal regulators. Federal intervention in the event a state was less than fully cooperative was provided in § 406(c)(2), 12 U.S.C. § 1729(c)(2) (1988) (repealed by FIRREA).

> Section 1729(c)(2) authorizes the Bank Board to "federalize" the receivership of a state-chartered association by appointing the FSLIC receiver (and *thus ending state control of the receivership* ) provided that the section's three statutory preconditions have been satisfied: (1) that either a state receivership has been in place for at least fifteen days or an insured institution has been closed under state law; (2) that at least one ground specified in 12 U.S.C. § 1464(d)(6)(A)[35] exists with respect to such institution; and (3) that a depositor has been unable to make a withdrawal of his account.

*Fidelity Sav. & Loan Ass'n,* 689 F.2d at 808 (emphasis added) (citations and footnote omitted).[36] This provision allowed federal

**36.** The Consent Agreement entered between the FHLBB and Spring Branch on December 30, 1985, contains the following recitation:

> WHEREAS, the Institution's board of directors acknowledges that grounds exist for the appointment of a conservator or receiver or other legal custodian for the Institution by the FHLBB pursuant to § 406 of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1729 (1982), *and that one or more grounds specified in § 5(d)(6)(A) of the Home Owners' Loan Act of 1933, as amended ["HOLA"], 12 U.S.C. § 1464(d)(6)(A) (1982), exist* with respect to the Institution; and ...

(Exhibit 22 to Defendants' Appendix; Docket Entry No. 154 at R602962) The finding that one of

regulators the opportunity to take over an ongoing state conservatorship or liquidation over the state's objection.

Between these two extremes was the intermediate mechanism provided in § 406(c)(1)(B), 12 U.S.C. § 1729(c)(1)(B) (1988) (repealed by FIRREA), that FHLBB employed in the case of Spring Branch. The Conservatorship Resolution evidences that FHLBB complied with the statutory conditions of that mechanism when it appointed a federal conservator for Spring Branch and illustrates how that mechanism worked.

WHEREAS, Pursuant to § 406(c)(1)(B) of the National Housing Act, as amended ("NHA"), 12 U.S.C. § 1729(c)(1)(B) (1982), as amended ("§ 406(c)(1)(B)"), the [FHLBB] has exclusive power and jurisdiction to appoint the FSLIC as sole conservator or receiver for an insured institution *other than a Federal association in the event the [FHLBB] determines that any of the grounds specified in § 5(d)(6)(A)(i), (ii), or (iii) of the Home Owners' Loan Act of 1933,* as amended ("HOLA"), 12 U.S.C. § 1464(d)(A)(i), (ii), or (iii) (1982), [sic] *exists* with respect to such insured institution; *and*

WHEREAS, Pursuant to subsection (ii)(I) of § 406(c)(1)(B), the authority conferred by § 406(c)(1)(B) may be exercised *without delay* with respect to the Association *upon receipt of the written approval of the State official* having jurisdiction over the Association that the ground specified by the [FHLBB] for its exercising such authority exists; ...

    ....

NOW, THEREFORE, IT IS RESOLVED, That, on the basis of the administrative record before the Bank Board, *the Bank Board finds that the ground for the appointment of a conservator set forth in § 5(d)(6)(A)(i) of the HOLA, 12 U.S.C.*

§ *1464(d)(6)(A)(i) (1982), exists* ... in that the Association is insolvent ... and

    ....

RESOLVED FURTHER, That the Bank Board hereby appoints the FSLIC as sole conservator for the Association ("Conservator"), pursuant to § 406(c)(1)(B) of the NHA, 12 U.S.C. § 1729(c)(1)(B) (1982), *provided that the exercise* of this appointment *shall not be effective ... unless and until* ... [one of several designated agents of the federal government] shall have received the *written approval of the Commissioner* [of the *TSLD* ] ....

(Exhibit 1 to Defendants' Appendix; Docket Entry No. 154 at R411173–R411175) The emphasized language demonstrates that FHLBB obtained exclusive jurisdiction to appoint FSLIC as conservator or receiver for Spring Branch under § 1729(c)(1)(B) only by determining that one of the *first three* grounds in § 5(d)(6)(A) of the pre-FIRREA Home Owners' Loan Act existed, 12 U.S.C. § 1729(c)(1)(B)(i)(I) (repealed by FIRREA),[37] *and* that the FHLBB could not exercise that authority until it had either obtained the state's written approval acknowledging that those grounds existed, 12 U.S.C. § 1729(c)(1)(B)(ii)(I) (1988) (repealed by FIRREA), or until it had waited 90–days, responded in writing to any of the State's written objections, and voted unanimously to act. 12 U.S.C. § 1729(c)(1)(B)(ii)(II) (1988) (repealed by FIRREA). In compliance with these statutory requirements, at page 3 of the Conservatorship Resolution FHLBB gave notice to the Texas Savings and Loan Commissioner of the existence of grounds to appoint FSLIC as sole conservator of Spring Branch, and resolved that the appointment of FSLIC as sole conservator of Spring Branch would not become effective until receipt of "written approval of the Commissioner."

the five grounds in § 1464(d)(6)(A) existed satisfied only one of the three requirements for aggressive federal intervention under § 406(c)(2), the one found at § 406(c)(2)(B), 12 U.S.C. § 1729(c)(2)(B) (1988) (repealed by FIRREA). Absent state appointment, federal conservatorship for Spring Branch could not have proceeded under the Consent Agreement until the FHLBB could also demonstrate that the remaining elements of § 1729(c)(2), including either closure of

the institution by state agencies or the appointment of a state conservator for greater than 15 days and the inability of the institution to satisfy a withdrawal request, had been satisfied.

**37.** The record contains no evidence that FHLBB made this determination earlier than when it recited that finding at page 2 of the Conservatorship Resolution on March 8, 1989.

Analysis of the three statutory mechanisms for achieving federal conservatorship over federally-insured, state-chartered savings and loans under 12 U.S.C. § 1729(c) (repealed by FIRREA), demonstrates that Congress never placed exclusive jurisdiction to appoint the conservator or receiver in the first instance in the federal regulatory agencies. The least intrusive method, provided in § 1729(c)(1)(A), delayed federal intervention until the state appointed FSLIC to act as state receiver. Section 1729(c)(1)(B) required the federal regulators to make a specific determination concerning the financial condition of the institution before they could usurp the state's authority to appoint a conservator, and stalled federal action until the state's passive participation through written approval had either been obtained or was demonstrated not to be forthcoming. Even the most intrusive form of federal intervention, provided by § 1729(c)(2), required federal regulators to wait until an uncooperative state agency had closed the institution or until a state-appointed conservator or receiver other than FSLIC had been in place for 15 days before acting.[38]

By erroneously arguing that FHLBB acted pursuant to § 5(d)(6) of the Home Owners' Loan Act when it appointed FSLIC conservator for Spring Branch, RTC has failed to understand the balance Congress achieved between state and federal regulators in § 406(c) of the National Housing Act.[39] RTC's confusion of the source of FHLBB's authority also stems from its failure to give meaning to all of the words in the first sentence of pre-FIRREA paragraph (14) of § 5(d) of the Home Owners' Loan Act. Mere participation in FSLIC's federal deposit insurance program did not transform a state-chartered savings and loan like Spring Branch into the equivalent of a federally-chartered "association." The full sentence stated:

As used in this subsection, the terms "Federal savings and loan association" and "association" shall include any institution with respect to which the Federal Home Loan Bank Board [*FHLBB*] now or hereafter has any *statutory* power of examination or supervision under any Act or joint resolution of Congress *other than* this chapter, the Federal Home Loan Bank Act [12 U.S.C. 1421 et seq.], and the National Housing Act [12 U.S.C. 1701 et seq.].

12 U.S.C. § 1464(d)(14) (1988) (emphasis added). RTC apparently overlooked the meaning of the emphasized words in this sentence. The application for federal deposit insurance gave FSLIC, not FHLBB, the power to examine Spring Branch. 12 U.S.C. § 1726(b) (1988) (repealed by FIRREA). Assuming *arguendo* that Congress intended the nominal distinction between FSLIC and FHLBB to be ignored due to their functional relationship, the power to examine Spring Branch was granted by *agreement,* not by statute.[40] Finally, RTC's interpretation completely ignores the exclusionary meaning of the phrase "other than" that precedes the words "National Housing Act" in paragraph (d)(14). Because the requirement that a savings and loan association allow FSLIC to examine its books and operations as a condition to obtaining federal deposit insurance *was contained* in the National Housing Act, *see* 12 U.S.C. §§ 1701 and 1726, the statutory grant for this power exempted institutions subject to examination under it from the definition of a "Federal savings and loan association" in 12 U.S.C. § 1464(d)(14).

**38.** *Cf. Fidelity Sav. & Loan Ass'n v. FHLBB,* 689 F.2d at 809–14 (concluding that § 1729(c)(2)'s requirements may be relaxed somewhat where FSLIC and the state agency are acting cooperatively); *accord Telegraph Sav. & Loan Ass'n v. Schilling,* 703 F.2d 1019, 1026 (7th Cir.), *cert. denied,* 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983).

**39.** The concurrent authority over appointment of conservators for federally-insured state-chartered savings and loan associations is a manifestation of Congress's continued respect for the dual system of state and federal regulatory and supervisory authority over deposit-taking financial institutions that predates the drafting of the Constitution of the United States. *See* Arthur E. Wilmarth, Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System,* 58 Fordham L. Review 1133, 1152–55 (1990).

**40.** Of course the statute made such an agreement a prerequisite to obtaining federal deposit insurance.

The federal statutory scheme under which Spring Branch operated balanced the right of the state as chartering authority to exercise concurrent jurisdiction to appoint a conservator or receiver with the federal interest in protecting the federal deposit insurance fund. This statutory scheme lends no support for RTC's argument that the court's interpretation of the Texas Savings and Loan Act violates the Supremacy Clause.

3. *Does RTC's "newly discovered evidence" raise a fact issue overlooked in the court's judgment?*

Apparently attempting to disguise the fact that it has discovered no new evidence relevant to the issues actually resolved in *M & O II*, RTC submits testimony of Bruce D. Weaver and Burdette W. Keeland, Jr., from depositions which were taken on November 12, and November 16, 1993, respectively. (attached as Exhibits 4 and 5 to Docket Entry No. 237) RTC advances these depositions as evidence that (a) the board of Spring Branch was in fact adversely dominated, and (b) the board member defendants were either negligent or grossly negligent and failed to perform their fiduciary duties in such a manner that the business judgment rule should not shield them from liability. Since the court never considered these issues when deciding that *all* claims, including RTC's negligence claims, are time-barred *even if* the board was adversely dominated for the entire time period RTC alleges, the court finds this evidence to be irrelevant to a reconsideration of its judgment.

## IV. *Conclusion*

Because RTC failed to serve its original Motion for New Trial upon defendants within the time prescribed by Fed.R.Civ.P. 59, the court treats its Amended Motion for New Trial (Docket Entry No. 236) as a motion for relief from judgment under Fed.R.Civ.P. 60. A review of the evidence and arguments submitted by RTC in support of the motion reveals that there exists no basis for relief from the judgment under any of the grounds available under Rule 60. Alternatively, even if the motion had been timely served, based upon the court's review of all of the evidence and arguments presented by RTC the court

concludes that there exists no basis for amending, altering, or vacating the final judgment under Rule 59. Accordingly, RTC's Amended Motion for New Trial (Docket Entry No. 236) is **DENIED**.